Addison Whitney, LLC v. Cashion, 2017 NCBC 23.

STATE OF NORTH CAROLINA

MECKLENBURG COUNTY

ADDISON WHITNEY, LLC,

          Plaintiff,

v.

BRANNON CASHION; VINCENT BUDD; RANDALL SCOTT; ANDREW CUYKENDALL; AMY BAYNARD; and JENNIFER RODDEN,

          Defendants.

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
17 CVS 1956

**ORDER AND OPINION ON PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

1. Plaintiff Addison Whitney LLC's ("Addison Whitney") Motion for Temporary Restraining Order and/or Preliminary Injunction pursuant to Rule 65 of the North Carolina Rules of Civil Procedure is currently pending before the Court.

2. Having considered the motion; the briefs, exhibits, and affidavits supporting and opposing the motion; and the parties' arguments at the hearing on March 7, 2017, the Court **GRANTS in part** and **DENIES in part** the motion for preliminary injunction.

> *Littler Mendelson, P.C., by Stephen D. Dellinger and Elise Hofer McKelvey, for Plaintiff.*

> *Van Hoy, Reutlinger, Adams & Dunn, PLLC, by G. Bryan Adams, III, for Defendants.*

Conrad, Judge.

I.
PROCEDURAL HISTORY

3. Addison Whitney filed its complaint and supporting affidavits on January 30, 2017. The complaint asserts six claims for relief, all of which arise out of the

circumstances surrounding Defendants' resignation from Addison Whitney with the intent to begin a competing business.

4. Addison Whitney's February 9, 2017 preliminary-injunction motion relies on only three causes of action: (1) misappropriation of trade secrets, (2) breach of contract, and (3) breach of fiduciary duty. Addison Whitney seeks to enjoin Defendants from using, disclosing, or otherwise misappropriating its confidential information and trade secrets; from soliciting or encouraging employees of Addison Whitney to leave the company; and from competing against Addison Whitney.

5. This motion has been fully briefed, and the Court held a hearing on March 7, 2017, where all parties were represented by counsel. The motion is ripe for determination.

## II.
## FINDINGS OF FACT

6. The Court makes the following findings of fact solely for the purpose of deciding this motion. These findings are not binding at a trial on the merits. *See Lohrmann v. Iredell Mem'l Hosp., Inc.*, 174 N.C. App. 63, 75, 620 S.E.2d 258, 265 (2005).

7. Addison Whitney, a North Carolina company, is a wholly owned subsidiary of inVentiv Health, Inc. (Compl. ¶¶ 3, 13.) Addison Whitney "specializes in verbal branding, visual branding, brand strategy, and research and analysis." (Compl. ¶ 13.) The company often assists pharmaceutical companies in creating pharmaceutical

brand names that the appropriate regulatory authority will approve. (Compl. ¶¶ 14–16.)

8.   Defendants Brannon Cashion, Vincent Budd, Randall Scott, Andrew Cuykendall, Amy Baynard, and Jennifer Rodden are former employees of Addison Whitney. Defendants all resigned from Addison Whitney on January 21, 2017. (Compl. ¶¶ 27–32.) At the time of their resignations, Cashion was Addison Whitney's President; Budd and Scott were Senior Vice Presidents; Cuykendall and Baynard were Vice Presidents; and Rodden was a Senior Project Manager. (Compl. ¶¶ 27–32.)

9.   All Defendants except for Rodden began their employment with Addison Whitney's predecessor, Addison Whitney, Inc. (Compl. ¶¶ 27–31.) During this period, Scott, Budd, Baynard, and Cuykendall each signed a Confidential Information and Unauthorized Disclosure agreement ("Unauthorized Disclosure Agreement"). Cashion did not sign this agreement. (Freeman-Greene Aff. Exs. A–E.)

10.   The Unauthorized Disclosure Agreement seeks to prevent the employee from using or disclosing

> any Confidential Information to any third party without the prior written consent of Addison Whitney, Inc. Furthermore, [employee] shall not disclose any Confidential Information to any Addison Whitney employee, consultant or temporary worker unless there is a legitimate business "need to know" such information by such employee, consultant or temporary worker.

(Freeman-Greene Aff. Exs. A–E.) It defines "Confidential Information" to mean "all data or information not generally known outside of Addison Whitney whether developed by or for Addison Whitney or received by Addison Whitney from an outside

source." (Freeman-Greene Aff. Exs. A–E.) The agreement further defines "Confidential Information" to include four categories of business or technical information, along with "any other information which, due to its nature, would cause a reasonable person to know that it is confidential and proprietary to Addison Whitney." (Freeman-Greene Aff. Exs. A–E.)

11. inVentiv acquired Addison Whitney, Inc. on June 1, 2007 via an asset purchase, dissolving the corporation and creating Addison Whitney, LLC as the successor. (Compl. ¶ 27.) Following the asset purchase, Addison Whitney required its employees to sign an Employee Confidentiality and Non-Compete Agreement ("Employee Confidentiality Agreement"). (*See* Kempf Aff. ¶ 6.) The Employee Confidentiality Agreement states that it is made "[a]s a condition of Employee's employment or continued employment," and no employee received any additional consideration in return for signing the agreement. (Freeman-Greene Aff. Exs. F–J.)

12. Cashion signed the Employee Confidentiality Agreement on September 1, 2007; and Scott, Budd, and Cuykendall signed it on September 17, 2007. (Freeman-Greene Aff. Exs. F–I.) Baynard did not sign this agreement. (Freeman-Greene Aff. ¶ 5.)

13. Although the title of the Employee Confidentiality Agreement refers to a "Non-Compete," the agreement does not include a covenant not to compete. (Freeman-Greene Aff. Exs. F–I.) Accordingly, the Court finds that Cashion, Budd, Scott, Cuykendall, and Baynard are not subject to a covenant not to compete.

14. The Employee Confidentiality Agreement includes a confidentiality and non-disclosure provision that is substantially similar to the one contained in the Unauthorized Disclosure Agreement. These provisions require the employee

> not to disclose, use, copy, publish, summarize, or remove from the premises of Addison Whitney any Information developed by Employee except (a) as necessary to carry out any assigned responsibilities as an Addison Whitney employee, and (b) after termination of employment, only as specifically authorized in writing by an officer of Addison Whitney.

(Freeman-Greene Aff. Exs. F–J.) The provisions further require that, upon termination, the employee must "promptly deliver to Addison Whitney all documents, data and other information pertaining to Information, and Employee shall not take any documents, or other information, or any reproduction or excerpt thereof, containing or pertaining to any Information." (Freeman-Greene Aff. Exs. F–J.)

15. The Employee Confidentiality Agreement also contains a non-solicitation provision. This provision requires employees not to "directly or indirectly hire, solicit or encourage or induce any employee, director, consultant, contractor or subcontractor to leave the employ of Addison Whitney" during the period of employment and for one year following termination. (Freeman-Greene Aff. Exs. F–J.)

16. When Addison Whitney hired Rodden in April 2010, she signed an Unauthorized Disclosure Agreement substantially similar to the one signed by the other Defendants. (Compl. ¶ 32; Freeman-Greene Aff. ¶ 4.) She also signed an Employee Confidentiality Agreement. (Freeman-Greene Aff. ¶ 5.) Unlike the

agreements signed by the other Defendants, Rodden's Employee Confidentiality Agreement includes a covenant not to compete in addition to the non-solicitation and confidential information provisions. (Freeman-Greene Aff. Ex. J.)

17.    In addition to requiring its employees to sign non-disclosure agreements, Addison Whitney took steps to protect its confidential information and to train employees regarding confidentiality. (*See* Compl. ¶ 38.) For example, Addison Whitney stores its documents and information on a password-protected server, which is not accessible to the public. (Guterma Aff. ¶ 5.)

18.    To facilitate its business of preparing regulatory submissions, Addison Whitney "created a database that contains information regarding drug product characteristics for nearly 4,000 drug products on the market." (McPhail Aff. ¶ 4.) Much of this information is publicly accessible and "has been gathered and organized" by Addison Whitney employees "over the course of seven years." (McPhail Aff. ¶ 5.) The database also includes information that is not publicly available and is chosen based on the "professional judgment" of Addison Whitney employees. (2d McPhail Aff. ¶ 18.) The information in the database would be difficult "to compile anew for each regulatory submission" and therefore provides a competitive advantage to Addison Whitney. (McPhail Aff. ¶¶ 4–5.)

19.    Addison Whitney maintains this database on its password-protected server. (*See* McPhail Aff. ¶ 4.) It also protects the database with a secondary password, given to only certain Addison Whitney employees. (*See* McPhail Aff. ¶ 4; 2d McPhail Aff. ¶ 19.)

20. Addison Whitney also maintains a collection of case studies, each of which contains information about work the company has done for a client. (*See* Guterma Aff. ¶ 4.) According to Addison Whitney, 246 case studies are confidential because they contain non-public information regarding its work and, sometimes, the confidential information of clients. (*See* Guterma Aff. ¶ 4.) Addison Whitney has published 46 additional case studies on the company's website; these case studies do not include sensitive business or client information. (*See* Guterma Aff. ¶¶ 7, 10.) The non-public case studies provide a competitive advantage to Addison Whitney in securing new business. (*See* McPhail Aff. ¶ 6; Compl. ¶ 22.) Addison Whitney stores these documents on the password-protected server. (*See* Guterma Aff. ¶ 5.)

21. Addison Whitney maintains its client and prospective client information on SalesForce, a password-protected, electronic platform. (*See* Guterma Aff. ¶ 3; Compl. ¶¶ 25–26, 37.) SalesForce contains non-public information about clients' buying habits and upcoming products that benefits Addison Whitney's business-development team. (*See* Guterma Aff. ¶ 3; Feenstra Aff. ¶ 5.) Addison Whitney permits only certain employees to access SalesForce. (*See* Feenstra Aff. ¶ 3.)

22. In 2016, Defendants began formulating a plan to leave Addison Whitney and create a competing company. On December 8, 2016, Addison Whitney's Director of Marketing Lizzy Guterma was informed that some of the Defendants might leave Addison Whitney. (Guterma Aff. ¶ 12; *see also* Lard Aff. ¶ 3.) On December 15, 2016, Cuykendall informed Rodden that several Defendants were planning to resign, and

the two discussed the possibility that Rodden might join them. (Guterma Aff. ¶¶ 13–15.) Defendants carried out this plan and resigned on January 21, 2017.

23.     In early to mid-January 2017, Cashion and inVentiv representative Dan Jones began discussing the possibility of a management buyout, where Defendants would buy Addison Whitney. (*See* Cashion Aff. ¶ 39; Eldredge Aff. ¶ 6.) These discussions continued after Defendants resigned, but the parties were unable to reach an agreement. (*See* Cashion Aff. ¶¶ 39, 45, 50–54.) Addison Whitney contends, and Defendants deny, that Cashion used the threat of opening a competing business as leverage during the negotiations. (*See* Eldredge Aff. ¶ 8; Cashion Aff. ¶ 39.)

24.     In the weeks prior to submitting their resignations, Defendants continued to access Addison Whitney's trade secrets and confidential information. Scott directed two Addison Whitney trainees to print and deliver to him hard copies of Addison Whitney's case studies and also to print and e-mail to him a list of prospective clients. (*See* Norrdahl Aff. ¶¶ 6, 7; Hansen Aff. ¶¶ 6, 7; Compl. ¶¶ 72, 79–80.) Scott also e-mailed Cashion a list of clients with open opportunities. (*See* 2d McPhail Aff. ¶ 6; Compl. ¶ 81.) Defendants Budd, Cuykendall, and Scott each accessed the SalesForce platform between January 13 and January 20, 2017. (*See* Feenstra Aff. ¶ 10.)

25.     Defendants also accessed, downloaded, copied, or printed a host of other documents both before and after resigning. Rodden accessed the guidelines for creating logos for clients, multiple templates, and approximately 50 other documents. (*See* Ragone Aff. ¶¶ 7, 14; Compl. ¶¶ 73, 75.) Between January 16 and 20, Cuykendall

accessed or printed approximately 100 documents, including templates, "client brand guidelines, market research, linguistic reports, naming strategy briefs, and client strategy presentations." (Bendinelli Aff. ¶ 7.) After resigning, Baynard and Rodden each accessed or printed dozens of additional documents. (*See* Bendinelli Aff. ¶¶ 8, 9.) Three Defendants have acknowledged that they continue to possess certain documents obtained during their employment with Addison Whitney. (*See* Supp. Budd Aff. ¶ 3; Supp. Cuykendall Aff. ¶¶ 10, 11; Rodden Aff. ¶ 30.)

26.     Although Addison Whitney contends that it has lost business since Defendants' departure, the record does not include evidence that Defendants have obtained that business or that Defendants are currently performing work for Addison Whitney's clients. At the time Defendants resigned, they did not have an operating business. (*See* Compl. ¶ 88.) Defendants had not leased office space, created a website or marketing materials, or purchased and set up servers. (*See, e.g.*, Cashion Aff. ¶ 44.) Defendants have also referred some clients back to Addison Whitney. (*See* Budd Aff. ¶ 48, Ex. 1; Scott Aff. ¶ 44; Cuykendall Aff. ¶ 58.)

### III.
### CONCLUSIONS OF LAW

27.     A preliminary injunction is "an extraordinary measure taken by a court to preserve the status quo of the parties during litigation." *Ridge Cmty. Inv'rs, Inc. v. Berry*, 293 N.C. 688, 701 239 S.E.2d 566, 574 (1977). The plaintiff bears the burden to establish the "right to a preliminary injunction," *Pruitt v. Williams*, 288 N.C. 368, 372, 218 S.E.2d 348, 351 (1975), and is entitled to relief only: "(1) if [the] plaintiff is

able to show [a] *likelihood* of success on the merits of his case and (2) if [the] plaintiff is likely to sustain irreparable loss unless the injunction is issued, or if, in the opinion of the Court, issuance is necessary for the protection of [the] plaintiff's rights during the course of litigation." *A.E.P. Indus., Inc. v. McClure*, 308 N.C. 393, 401, 302 S.E.2d 754, 759–60 (1983) (internal quotation marks omitted).

28. "Injunctive relief is granted only when irreparable injury is real and immediate." *Hall v. City of Morganton*, 268 N.C. 599, 600–01, 151 S.E.2d 201, 202 (1966). The plaintiff may demonstrate irreparable injury by showing that "the injury is beyond the possibility of repair or possible compensation in damages" or "that the injury is one to which the complainant should not be required to submit or the other party permitted to inflict, and is of such continuous and frequent recurrence that no reasonable redress can be had in a court of law." *A.E.P.*, 308 N.C. at 407, 302 S.E.2d at 763 (emphasis omitted). A court should not enter an injunction if there is a "full, complete and adequate remedy at law." *Bd. of Light & Water Comm'rs v. Parkwood Sanitary Dist.*, 49 N.C. App. 421, 423, 271 S.E.2d 402, 404 (1980); *see also A.E.P.*, 308 N.C. at 406, 302 S.E.2d at 762. In addition, the trial court must weigh the potential harm a plaintiff will suffer if no injunction is entered against the potential harm to a defendant if the injunction is entered. *See Williams v. Greene*, 36 N.C. App. 80, 86, 243 S.E.2d 156, 160 (1978).

29. For the reasons discussed below, the Court determines that Addison Whitney is entitled to a preliminary injunction, but limited to its request to prevent Defendants from using and retaining Addison Whitney's confidential information and

trade secrets. The Court determines that Addison Whitney is not entitled to an order enjoining Defendants from competing against Addison Whitney or soliciting its employees.

### A. Misappropriation of Trade Secrets

30. Addison Whitney first argues that the Court should enjoin Defendants from using its trade secrets. Addison Whitney identifies three categories of information that it contends are trade secrets: its database of drug information; its collection of 246 non-public case studies; and its client lists and related information contained in the Salesforce platform. (Pl.'s Br. in Supp. Prelim. Inj. 4–5 ["Pl.'s Op. Br."].)

31. In their opposition brief, Defendants argue that Addison Whitney failed to identify any protectable trade secrets. (*See* Defs.' Br. in Supp. Prelim. Inj. 6–8 ["Defs.' Resp."].) At the hearing, Defendants' counsel appeared to retreat from that position, challenging only the non-public case studies. Nevertheless, the Court will consider Defendants' arguments as briefed.

32. The North Carolina Trade Secrets Protection Act defines a trade secret to include "business or technical information," including a "compilation of information," that satisfies certain conditions. N.C. Gen. Stat. § 66-152(3). The information must "[d]erive[] independent actual or potential commercial value from not being generally known or readily ascertainable through independent development or reverse engineering by persons who can obtain economic value from its disclosure or use." *Id.*

In addition, the information must be "the subject of efforts that are reasonable under the circumstances to maintain its secrecy." *Id.*

33. The Court generally considers six factors to determine if information qualifies as a trade secret:

> (1) [t]he extent to which information is known outside the business; (2) the extent to which it is known to employees and others involved in the business; (3) the extent of measures taken to guard secrecy of the information; [4] the value of information to business and its competitors; [5] the amount of effort or money expended in developing the information; and [6] the ease or difficulty with which the information could properly be acquired or duplicated by others.

*Wilmington Star-News, Inc. v. New Hanover Reg'l Med. Ctr.*, 125 N.C. App. 174, 180–81, 480 S.E.2d 53, 56 (1997). As this Court recently explained, "[t]he factors overlap, and courts considering these factors do not always examine them separately and individually." *Computer Design & Integration, LLC v. Brown*, 2017 NCBC LEXIS 8, at *23 (N.C. Super. Ct. Jan. 27, 2017).

34. The Court concludes, for the purpose of deciding this motion, that all three categories of information constitute protectable trade secrets. Contrary to Defendants' argument, Addison Whitney's database of drug information is not "simply a tool of convenience." (Defs.' Resp. 6.) It is a voluminous compilation of both private and publicly available information, which required approximately 1,000 hours of work over a 7-year period to create. (*See* McPhail Aff. ¶¶ 4–5; 2d McPhail Aff. ¶¶ 16–18.) The database provides a competitive advantage by ensuring that Addison Whitney employees have quick, accurate access to drug information for regulatory submissions. (*See* McPhail Aff. ¶ 5; 2d McPhail Aff. ¶¶ 21–23.) In

addition, Addison Whitney protects the secrecy of the database by maintaining it on a password-protected server and requiring a secondary password to access the database. (*See* McPhail Aff. ¶ 4; 2d McPhail Aff. ¶¶ 19–20.) The database is entitled to trade-secret protection because of its competitive value, Addison Whitney's effort to keep it secret, and the amount of time and effort required to create and maintain it. *See, e.g., Sunbelt Rentals, Inc. v. Head & Engquist Equip., L.L.C.*, 174 N.C. App. 49, 53–56, 620 S.E.2d 222, 226–28 (2005) (affirming trial court's holding that compilation of business information was protectable as trade secret).

35.     Addison Whitney's confidential client information is also protectable as a trade secret. Although Defendants object that Addison Whitney publishes the names of its clients on its public website (Defs.' Resp. 8), the SalesForce platform includes protectable, non-public information of a different nature. The information includes open business opportunities, clients' past buying habits, and upcoming products. (*See* Guterma Aff. ¶ 3.) This information is valuable to Addison Whitney's business-development team, not generally known to the public, and maintained on a password-protected platform with access limited to certain employees. (*See* Guterma Aff. ¶ 3; Compl. ¶ 26.) North Carolina courts routinely hold that such information is protectable as a trade secret. *See, e.g., Drouillard v. Keister Williams Newspaper Servs., Inc.*, 108 N.C. App. 169, 174, 423 S.E.2d 324, 327 (1992); *Computer Design*, 2017 NCBC LEXIS 8, at \*27–28.

36.     The non-public case studies present a closer question. According to Addison Whitney, these documents describe confidential work performed for clients;

sometimes contain confidential client information; are maintained on a password-protected server; and provide a competitive advantage when used for internal purposes and for client pitches. (*See* Guterma Aff. ¶¶ 4, 5, 9; 2d Guterma Aff. ¶ 5; McPhail Aff. ¶¶ 6, 7, 11.) Defendants contend that these case studies are not actually confidential because Addison Whitney and its employees frequently send the case studies to clients without confidentiality restriction and also post the information on the company's public website. (*See* Defs.' Resp. 7–8; Cashion Aff. ¶ 15.)

37.     Having considered the record as a whole, the Court finds Addison Whitney's argument persuasive. Although Addison Whitney has posted a number of case studies to its public website, the company removed sensitive business information before posting them and does not seek protection for the remaining publicly available information. (*See* McPhail Aff. ¶¶ 9, 12.) Addison Whitney's affidavits sufficiently establish that it maintains the confidentiality of 246 non-public case studies and that these studies have competitive value. (*See* McPhail Aff. ¶ 6.) Accordingly, on this record, the Court concludes that Addison Whitney's non-public case studies are entitled to trade-secret protection.

38.     The Court next considers whether Addison Whitney is likely to succeed on its claim for misappropriation. A prima facie case of misappropriation requires substantial evidence that the wrongdoer "(1) [k]nows or should have known of the trade secret; and (2) [h]as had a specific opportunity to acquire it for disclosure or use or has acquired, disclosed, or used it without the express or implied consent or authority of the owner." N.C. Gen. Stat. § 66-155. Although a party can rely on

circumstantial evidence to establish a prima facie case, *see TSG Fishing, LLC v. Bollinger*, 238 N.C. App. 586, 595, 767 S.E.2d 870, 878 (2014), a wrongdoer's access to and opportunity to acquire a trade secret—without more—is insufficient, *see Am. Air Filter Co. v. Price*, 2017 NCBC LEXIS 9, at \*23 (N.C. Super. Ct. Feb. 3, 2017). Rather, there must be *substantial evidence* (1) that the wrongdoer accessed the trade secret without consent, or (2) of misappropriation resulting in an inference of actual acquisition or use of the trade secret. *Id.*

39. In this case, because Defendants are former employees with access to the protected information as part of their job duties, Addison Whitney must show that Defendants accessed that information without permission. *See RLM Commc's, Inc. v. Tuschen*, 831 F.3d 190, 202 (4th Cir. 2016). For example, an employer may demonstrate unauthorized access by showing that an employee continued to access trade secrets after receiving a job offer from a competitor and then later accepted the offer. *See Am. Air Filter*, 2017 NCBC LEXIS 9, at \*24. Here, the relevant inquiry is when Defendants' plan to resign and to open their own competing business became sufficiently concrete to render continued access to trade secrets unauthorized.

40. Addison Whitney contends that Defendants began conspiring to resign in the summer of 2016 and that any access of trade secrets after that point was unauthorized. (*See* Pl.'s Op. Br. 9.) The Court disagrees. Addison Whitney bases its argument solely on an unsworn allegation in its Complaint that Defendants applied to trademark the name "Leaderboard Branding" on July 28, 2016. (Compl. ¶ 57.) In the absence of evidence of additional actions by Defendants during that time, the

Court cannot conclude that Defendants' continued performance of their duties (which involved access to confidential information) was suspicious or unauthorized.

41. The record reveals a narrower range of unauthorized access. Addison Whitney has introduced evidence that, as of December 2016, Defendants reported to others their intent to resign and create a competing business. (*See* Guterma Aff. ¶¶ 12, 13; Compl. ¶¶ 65–69.) The Court therefore concludes that Defendants' access of information during and after December 2016 may support an allegation of unauthorized access and a prima facie case of misappropriation.

42. Addison Whitney has not identified any instance in which a Defendant accessed the drug-information database after December 2016. It argues only that Defendant Rodden obtained a copy of the database in October 2016—two months before she became aware that the other Defendants were considering leaving the company. (*See* Pl.s' Op. Br. 9; Ragone Aff. ¶ 6; McPhail Aff. ¶ 15.) Addison Whitney has failed to demonstrate that Defendants accessed the database at any other time; that any other documents accessed by Defendants are encompassed in the database; or that Defendants continue to possess the database. On this record, the Court concludes that Addison Whitney has not shown threatened misappropriation of the drug-information database.

43. By contrast, Addison Whitney has introduced substantial evidence that Defendants accessed protected client information and case studies just prior to resigning. For example, Scott obtained a list of prospective clients on January 5; directed two trainees to print all case studies and give him the copies on January 13;

e-mailed Cashion a list of clients with open opportunities on January 16; and logged into SalesForce on January 20. (*See* Norrdahl Aff. ¶¶ 6, 7; Hansen Aff. ¶¶ 6, 7; Feenstra Aff. ¶ 10; 2d McPhail Aff. ¶ 6; *see also* Compl. ¶¶ 72, 81.) In addition, Budd and Cuykendall logged into SalesForce on January 13 and 17, respectively. (*See* Feenstra Aff. ¶ 10.) Given the close proximity to Defendants' resignations and their undisputed intent to compete against Addison Whitney, the Court concludes that Defendants accessed this information without permission and that Addison Whitney is likely to succeed on its claim for misappropriation.

44. Defendants respond that they do not continue to possess any protected information. (*See* Cashion Aff. ¶¶ 14, 15, 17; Budd Aff. ¶¶ 13, 14, 16; Scott Aff. ¶¶ 12, 13, 15; Cuykendall Aff. ¶¶ 16, 18, 23; Baynard Aff. ¶ 16; Rodden Aff. ¶¶ 9, 10.) The Court has considered these blanket denials of wrongdoing and finds them insufficient to rebut Addison Whitney's showing. *See Am. Air Filter*, 2017 NCBC LEXIS 9, at *25–26 (granting preliminary injunction despite defendant's denial of possession of trade secrets).

45. Defendants also contend that they accessed these documents only "to perform their job duties." (Defs.' Resp. 10.) That argument would be compelling for events *before* December 2016. But continued access to trade secrets at a time when Defendants were planning to leave the company and then compete against it "is precisely the type of threatened misappropriation, if not actual misappropriation, that the [statute] aims to prevent through issuance of a preliminary injunction." *TSG Finishing, LLC v. Bollinger*, 238 N.C. App. 586, 595, 767 S.E.2d 870, 878 (2014); *see*

*also Horner Int'l Co. v. McKoy*, 232 N.C. App. 559, 570, 754 S.E.2d 852, 860 (2014) ("Defendant's knowledge of trade secrets and opportunity to use those" in a competing business "create a threat of misappropriation.").

46.     For these reasons, the Court concludes that Addison Whitney would be irreparably harmed in the absence of an order enjoining Defendants from using and disclosing its trade secrets. This harm is immediate and ongoing, and Addison Whitney has no adequate remedy at law. *See* N.C. Gen. Stat. § 66-154(a) ("actual or threatened misappropriation of a trade secret may be preliminarily enjoined"). A preliminary injunction is therefore necessary to protect Addison Whitney's rights during the course of the litigation.

47.     The irreparable harm that Addison Whitney would suffer in the absence of injunctive relief far outweighs any potential harm to Defendants if the injunction is issued. Defendants will suffer little or no harm if the injunction is issued because they submitted affidavits stating that they could obtain similar information through other means. (*See* Cashion Aff. ¶¶ 8, 14, 17.)

48.     Accordingly, in its discretion, the Court concludes that Addison Whitney is entitled to a preliminary injunction preventing Defendants and all persons in active concert or participation with any Defendant from retaining, using, disclosing, or distributing any trade secret information improperly accessed during or after December 2016. Defendants remain free, however, to use their own skills, experience, and personal relationships with clients. *See, e.g.*, *Analog Devices, Inc. v. Michalski,* 157 N.C. App. 462, 471, 579 S.E.2d 449, 455 (2003); *Novacare Orthotics & Prosthetics*

*E., Inc. v. Speelman*, 137 N.C. App. 471, 478, 528 S.E.2d 918, 922 (2000); *Travenol Labs., Inc. v. Turner*, 30 N.C. App. 686, 695, 228 S.E.2d 478, 485 (1976).

## B. Breach of Contract

49.     Addison Whitney asserts two claims for breach of contract. First, it argues that Defendants Cashion, Scott, Budd, and Cuykendall breached a non-solicitation provision in their Employee Confidentiality Agreements. Second, it contends that all Defendants breached restrictions on the use and disclosure of confidential information in the Unauthorized Disclosure Agreement and the Employee Confidentiality Agreement.

50.     Cashion, Scott, Budd, and Cuykendall contend that their Employee Confidentiality Agreements, including the non-solicitation provisions, are not enforceable due to a lack of consideration. All Defendants contend that they have not breached any provision.[1]

### 1. Non-solicitation Restrictions

51.     The Court first considers the non-solicitation provision in the Employee Confidentiality Agreements, which were signed by all Defendants except Baynard.

52.     Cashion, Scott, Budd, and Cuykendall contend that their Employee Confidentiality Agreements were not based on valuable consideration and are

---

[1] Rodden also contends that the covenant not to compete in her Employee Confidentiality Agreement is overbroad and unenforceable. (*See* Defs.' Resp. 17–19.) Addison Whitney has not sought a preliminary injunction on the basis of that provision, and the Court therefore declines to address the issue.

therefore unenforceable. Addison Whitney alleges that the agreements were executed "in consideration for . . . employment with Addison Whitney, LLC." (Compl. ¶ 41.) Accordingly, the Court must decide whether Defendants' employment relationship with Addison Whitney was itself valuable consideration.

53. The issue boils down to a question of timing. A contract, or "any modification to an existing contract," must be supported by consideration. *RoundPoint Mortg. Co. v. Florez*, 2016 NCBC LEXIS 17, at \*46 (N.C. Super. Ct. Feb. 18, 2016). An offer of employment "may serve as consideration" when the employee makes a promise at the beginning of the employment relationship "as a part of the initial employment terms." *Id.* at \*47. If the agreement is entered into after the creation of the employment relationship, it must be supported by new consideration beyond the promise of continued at-will employment. *See id.* at \*48 (citing *Kadis v. Britt*, 224 N.C. 154, 161–63, 29 S.E.2d 543, 547–49 (1944)). Thus, because Addison Whitney relies on only the employment relationship as consideration (and not a pay raise or other incentive), it must demonstrate that the restrictions in the Employee Confidentiality Agreements were entered into at the time Defendants' employment began.

54. Addison Whitney has not carried its burden. There is no dispute that Cashion, Scott, Budd, and Cuykendall's employment relationships began in June 2007. That is the date inVentiv purchased the assets of Addison Whitney, Inc., which terminated these Defendants' existing employment relationships and initiated new employment with Addison Whitney, LLC. *See AmeriGas Propane, LP v. Coffee*, 2014

NCBC LEXIS 4, at *9–10 (N.C. Super. Ct. Feb. 11, 2014). Yet Defendants did not sign the Employee Confidentiality Agreements until September 2007—roughly 90 days *after* their employment relationship began. (Freeman-Green Aff. Exs. F–I.)

55.     In its reply, Addison Whitney contends that the 90-day gap "was simply a result of [Defendants'] receiving a 'reasonable amount of time' to sign the agreements." (Pl.'s Reply in Supp. Prelim. Inj. 5 n.1 ["Pl.'s Reply"]; *see also* Kempf Aff. ¶ 7.) This explanation does not hold water. Defendants testify that they first received the agreements in September 2007, and Addison Whitney has not introduced any evidence that it first obtained Defendants' oral agreement at the time of employment and then merely reduced the agreement to writing later. (*See* Supp. Budd Aff. ¶ 11; Supp. Cashion Aff. ¶ 30; Supp. Scott Aff. ¶ 8; Supp. Cuykendall Aff. ¶ 13.)

56.     Based on this record, the Court concludes that Defendants Cashion, Scott, Budd, and Cuykendall were already employed at the time they entered into the Employee Confidentiality Agreements. The agreements therefore lack consideration and are unenforceable. *See Whittaker Gen. Med. Corp. v. Daniel*, 324 N.C. 523, 527, 379 S.E.2d 824, 827 (1988). As a result, Addison Whitney is not likely to succeed on its claim that these Defendants breached the agreements, including the non-solicitation provisions, and it is not entitled to a preliminary injunction on that basis.

57.     This conclusion also applies to Defendant Baynard because she did not sign an Employee Confidentiality Agreement. In addition, although Defendant Rodden concedes that she is subject to a valid non-solicitation restriction, Addison Whitney

has not argued that she breached the provision. (*See* Pl.'s Op. Br. 19 (arguing only that other Defendants solicited "Baynard and Rodden to leave Addison Whitney").)

58. The Court therefore holds that Addison Whitney is not entitled to a preliminary injunction based on its claim for breach of any contractual non-solicitation restriction.

## 2. Confidentiality and Non-disclosure Restrictions

59. Addison Whitney also contends that Defendants breached contractual provisions covering the use and disclosure of confidential information. "The elements of a claim for breach of contract are (1) existence of a valid contract and (2) breach of the terms of that contract." *Carcano v. JBSS, LLC*, 200 N.C. App. 162, 168, 684 S.E.2d 41, 47–48 (2009) (quoting *Poor v. Hill*, 138 N.C. App. 19, 26, 530 S.E.2d 838, 843 (2000)) (internal quotation marks omitted).

60. The Court concludes that Addison Whitney is not likely to succeed on its claim that Cashion, Scott, Budd, and Cuykendall breached the non-disclosure provisions in their Employment Confidentiality Agreements. As discussed above, the agreements are unenforceable for lack of consideration.

61. It is undisputed, however, that Scott, Baynard, Budd, Cuykendall, and Rodden (but not Cashion) entered into valid and enforceable restrictions contained in the Unauthorized Disclosure Agreement. Rodden is also subject to additional restrictions in the Employee Confidentiality Agreement, which she concedes is valid and enforceable.

62. The Court concludes that the restrictions in the two agreements are in essence the same and cover equivalent types of confidential information. The essential inquiry is whether Defendants improperly accessed, used, copied, disclosed, or removed Addison Whitney's confidential information, which broadly includes technical, financial, and other business information that is not readily available to the public.

63. For purposes of this analysis, the Court reiterates its conclusion that Addison Whitney has introduced sufficient evidence that Defendants intended to resign from Addison Whitney and to create a competing business as early as December 2016. Accordingly, Addison Whitney may show that Defendants' continued access of confidential information after that date "was not authorized." *Am. Air Filter*, 2017 NCBC LEXIS 9, at *24.

64. Addison Whitney has carried its burden by introducing evidence that Defendants repeatedly accessed large volumes of confidential documents just prior to and shortly after resigning. Several Defendants accessed, downloaded, or printed numerous documents just prior to submitting their resignations. (*See* Bendinelli Aff. ¶ 7.) Defendants Baynard and Rodden accessed or printed documents *after* submitting their resignations. (*See* Bendinelli Aff. ¶¶ 8, 9.) In addition, Budd, Cuykendall, and Rodden each admit that they currently possess at least some documents that they obtained during their employment with Addison Whitney. (*See* Supp. Budd Aff. ¶ 3; Supp. Cuykendall Aff. ¶¶ 10, 11; Rodden Aff. ¶ 30.)

65. Although Addison Whitney has not identified the nature of each accessed document, it has demonstrated that these documents include confidential information, as defined by the two agreements. The documents that Defendants accessed or currently have in their possession include logo guidelines, templates, market research, linguistic reports, naming strategy briefs, and a Business Development Training Manual, among other documents. (*See* Pl.'s Op. Br. 18; Ragone Aff. ¶¶ 7, 14; Bendinelli Aff. ¶ 7.) They were created by Addison Whitney employees to assist them in performing their employment responsibilities, and there is no evidence that they were generally known outside of Addison Whitney. Indeed, Defendants do not appear to dispute that at least some of these documents are covered by the relevant non-disclosure restrictions.

66. Thus, Addison Whitney has established a likelihood of success on its claim for breach of the Unauthorized Disclosure Agreements and the non-disclosure clause in Rodden's Employee Confidentiality Agreement. The Court concludes that Addison Whitney is entitled to a preliminary injunction because it will be irreparably harmed if Defendants use or disclose Addison Whitney's confidential information, and a preliminary injunction is therefore necessary to protect its rights during the course of the litigation. The Court further concludes that the potential harm to Addison Whitney outweighs any potential harm to Defendants that would result from the issuance of an injunction.

67. Accordingly, in its discretion, the Court concludes that Addison Whitney is entitled to a preliminary injunction preventing Defendants and all persons in active

concert or participation with them from using or disclosing Addison Whitney's confidential information.

## C. Breach of Fiduciary Duty

68. Addison Whitney claims that Defendants Cashion, Budd, Scott, Cuykendall, and Baynard breached their fiduciary duties by soliciting employees to leave the company, conspiring to resign on the same day, and planning to form a competing business. (*See* Pl.'s Op. Br. 19.) As relief, Addison Whitney requests that the Court enter an injunction prohibiting Defendants from "working by and between themselves to compete against Addison Whitney" for one year. (Pl.'s Op. Br. 2.)

69. The parties vigorously dispute whether Addison Whitney has demonstrated a likelihood of success, including specifically whether it has shown that Defendants owed a fiduciary duty to Addison Whitney. (*See* Defs.' Resp. 21–22; Pl.'s Reply 2–4.) The Court does not need to resolve these disputes because it concludes that Addison Whitney has not carried its burden to show irreparable harm.

70. In its opening brief, Addison Whitney makes no effort at all to identify the irreparable harm allegedly caused by the breach of fiduciary duty. (Pl.'s Op. Br. 20–21 (discussing only alleged trade secret misappropriation and violation of non-disclosure and non-solicitation agreements).) In addition, Addison Whitney averred that it "is *not* asking that Defendants be enjoined from pursuing their business." (Pl.'s Op. Br. 21 (emphasis added).) In the absence of any meaningful argument by Addison Whitney, the Court is not convinced that "compensation in money cannot atone for" any harm caused by the alleged breach of fiduciary duty. *Hodge v. NC*

*DOT*, 137 N.C. App. 247, 252, 528 S.E.2d 22, 26 (2000) *rev'd on other grounds*, 352 N.C. 664, 535 S.E.2d 32 (2000); *see also Computer Design*, 2017 NCBC LEXIS 8, *36–37 (denying preliminary injunction); *Air Cleaning Equip. v. Clemens*, 2016 N.C. Super. LEXIS 121, at *27–28 (N.C. Super. Ct. Apr. 29, 2016) (same).

71.     Furthermore, Addison Whitney has cited only two cases imposing a preliminary injunction for breach of fiduciary duty. *See Lake House Academy for Girls LLC v. Jennings*, 2011 NCBC LEXIS 41 (N.C. Super. Ct. Oct. 13, 2011); *GoRhinoGo, LLC v. Lewis*, 2011 NCBC LEXIS 28 (N.C. Super. Ct. Sept. 29, 2011). In each case, the court awarded injunctive relief against a manager of an LLC who, while serving in that role, competed against the LLC and took affirmative action to harm it. *See Lake House Academy*, 2011 NCBC LEXIS 41, at *15–17 (LLC manager made disparaging public comments about LLC in addition to executing lease and hiring employees for competing business); *GoRhinoGo,* 2011 NCBC LEXIS 39, at *3–5 (LLC manager attempted "to drive [LLC] out of business," including draining bank accounts and beginning summary ejectment proceedings).

72.     The egregious facts in these cases are simply not present here. There are no allegations that Defendants made disparaging comments to Addison Whitney clients, actively attempted to harm Addison Whitney's business, or began a competing business prior to resigning. (*See* Guterma Aff. Ex. A; Rodden Aff. ¶¶ 11, 33; Scott Aff. ¶¶ 36–37, 40; Cuykendall Aff. ¶ 52.) Rather, Defendants' evidence shows that they have referred clients to Addison Whitney even after resigning from the company. (*See, e.g.*, Budd Aff. ¶ 48 & Ex. 1; Scott Aff. ¶ 44; Cuykendall Aff. ¶ 56.)

73. It also bears mention that Addison Whitney did not obtain a covenant not to compete from five of the Defendants, and it has not sought to enforce the one obtained from Defendant Rodden. The Court has also concluded that the non-solicitation provisions are unenforceable. By attempting to enjoin Defendants' new competing business, Addison Whitney's "requested relief seeks to provide [it] the benefit of a bargain [it] did not make without adequate basis or justification." *Computer Design*, 2017 NCBC LEXIS 8, at \*36.

74. The Court concludes that Addison Whitney has not shown the likelihood that it will suffer irreparable harm due to a breach of fiduciary duty. Accordingly, in its discretion, the Court denies a preliminary injunction on this claim.

## IV.
## CONCLUSION

75. Based on the findings of fact and conclusions of law, the Court in its discretion orders that, pending resolution of this action, and until otherwise ordered:

a. Defendants, and any persons or entities in active concert with them, are ENJOINED from using or disclosing Addison Whitney's 246 non-public case studies; and the client information Addison Whitney maintains on the SalesForce platform, including information regarding open client opportunities, clients' past buying habits, clients' upcoming products, clients' available finances, and associated commentary prepared by Addison Whitney employees.

b. Defendants, and any persons or entities in active concert with them, are ENJOINED from using or disclosing Addison Whitney's confidential

information, including but not limited to Addison Whitney's Business Development Training Manual; logo guidelines; templates; client brand guidelines; market research; linguistic reports; naming strategy briefs; and client strategy presentations.

c.     Defendants are ORDERED to return within 10 days to Addison Whitney any documents or other property in Defendants' possession that fall within the scope of paragraphs 75(a) and (b).  Defendants are further ORDERED to file a statement with the Court no later than 30 days after entry of this Order certifying that they have fully complied with the requirements of this paragraph.

d.     This Order shall become effective upon Addison Whitney's posting security in the amount of $5,000, which the Court concludes, in its discretion, is reasonable and appropriate as a condition of granting the preliminary injunction.  *See* N.C. Gen. Stat. § 1A-1; N.C. R. Civ. P. 65(c).  Any party may move the Court to adjust the amount of security required for good cause.

e.     Except as GRANTED by the terms of this Order, the motion is DENIED.

This the 15th day of March 2017.


/s/ Adam M. Conrad
Adam M. Conrad
Special Superior Court Judge
 for Complex Business Cases