SUNBELT RENTALS, INC., Plaintiff-Appellee v. HEAD & ENGQUIST EQUIPMENT, L.L.C., d/b/a H&E HI-LIFT, ROBERT HEPLER, DOUGLAS KLINE, MICHAEL QUINN, GREGG L. CHRISTENSEN, PATRICK C. MULDOON, MICHELE U. DOUGHERTY, and BRIAN W. PEARSALL, Defendant-Appellants

No. COA04-862

(Filed 18 October 2005)

1. Trade Secrets— compiled business information—construction equipment rental business

The trial court did not err by concluding that plaintiff's compilation of business information constitutes a trade secret. The trial court determined that the disputed information was not generally known outside the company, was only discreetly disclosed within the company, was guarded as a secret, was competitively valuable, was developed at significant cost; and was difficult to acquire or duplicate.

2. Trade Secrets— construction rental companies—hiring branch managers—using confidential information

The trial court did not err in an action between construction equipment rental companies by finding that defendants misappropriated trade secrets and violated the Unfair and Deceptive Trade Practices Act through the hiring of branch managers who used plaintiff's confidential information to obtain sales and convert former customers. N.C.G.S. § 66-152: N.C.G.S. § 75-1.1.

3. Unfair Trade Practices— damages—hiring of branch managers and use of confidential data—misappropriation of trade secrets and unfair practices—lost profits and benefit received

The trial court did not err by finding that defendant's hiring of plaintiff's branch managers and their use of confidential data proximately caused plaintiff's damages for misappropriation of trade secrets and unfair and deceptive trade practices. Moreover, under the Unfair and Deceptive Trade Practices Act, lost profits

SUNBELT RENTALS, INC. v. HEAD & ENGQUIST EQUIP., L.L.C.

[174 N.C. App. 49 (2005)]

and the benefit defendant received are different types of damages and the award of both is permitted.

**4. Laches— misappropriation of trade secrets from purchased company—no delay in action**

Plaintiffs were not barred by laches from seeking relief for a competitor's hiring of its managers and the misappropriation of trade secrets. There was no delay in bringing the action and no prejudice.

Appeal by defendants from an order dated 13 August 2003 by Judge Ben F. Tennille in Special Superior Court for Complex Business Cases. Heard in the Court of Appeals 3 March 2005.

*Helms, Mulliss & Wicker, P.L.L.C., by E. Osborne Ayscue, Jr., Irving M. Brenner, Catherine E. Thompson and Paul M. Navarro, for defendant-appellants.*

*Parker, Poe, Adams & Bernstein, L.L.P., by Jack L. Cozort, William L. Rikard, Jr., Eric D. Welsh, Deborah L. Edney and Heather N. Oakley, for plaintiff-appellee.*

BRYANT, Judge.

Head & Engquist Equipment, L.L.C., (d/b/a H&E Hi-Lift), Robert Hepler, Douglas Kline, Michael Quinn, Gregg L. Christensen, and Brian W. Pearsall, (collectively defendants) appeal from an Order and Opinion dated 13 August 2003 finding defendants jointly and severally liable to Sunbelt Rentals, Inc. (plaintiff) under the North Carolina Trade Secrets Protection Act (NCTSPA) and the N.C. Unfair and Deceptive Trade Practices Act (UDTPA). Plaintiff was awarded damages[1] in the amount of $16,200,000.00, plus pre- and post-judgment interest of eight percent.

## Procedural History/Facts

This dispute arose between corporate parties who are competitors in the market for the rental of construction equipment, specifically aerial work platforms (AWP). The business of renting AWP equipment and the pricing of such equipment is extremely competitive. Sunbelt Rentals, Inc. (plaintiff) purchased BPS Equipment Rental and Sales (BPS) in June 2000. Former employees of BPS are named as individual defendants in this action: Robert Hepler

---

1. $5,000,000.00 in damages which were trebled to $15,000,000.00 and attorney's fees in the amount of $1,200,000.00.

(President), Douglas Kline (Vice President of Finance), Michael Quinn (Senior Manager), Gregg L. Christensen (Dallas Western Regional Manager) and Brian W. Pearsall (Charlotte Branch Manager).

In August 1999, Hepler and Kline learned via the internet that BPS was to be sold. Together, they developed an Aerial Equipment Specialists Plan (AES Plan) which included specific fleet mixes for each of the proposed branches to coincide with the local rental markets, including specific employee compensation rates which were "formulated by experience in each of the markets to maximize utilization." Hepler and Kline were unsuccessful in their attempt to sell the AES Plan. In November 1999, Hepler and Kline resigned from BPS and in December 1999 began working for H&E's Hi-Lift Division. Hepler was employed as President, while Kline was employed as Executive Vice President and Chief Financial Officer. Hepler and Kline, while performing in a similar capacity as they had at BPS, began to implement their AES Plan for H&E in seven southeastern cities including: Atlanta, Charlotte, Orlando, Dallas, Houston, Tampa/Fort Meyers, and Fort Lauderdale. A major concern of H&E in implementing the AES plan was the availability of the right personnel to "grow the business." By June 2000, former BPS branch managers in Atlanta, Charlotte, Tampa/Fort Meyers, and Orlando had been recruited and hired by H&E to perform similar duties within their respective geographical areas. H&E had no previous market presence in Atlanta, Charlotte, Orlando, Dallas, Houston, Tampa/Fort Meyers, or Fort Lauderdale. In each location, after the conversion of former BPS branch managers, a significant number of key BPS personnel[2], if not all, were employed by H&E.

On 14 July 2000 plaintiff filed this action asserting claims for: breach of fiduciary duty; aiding and abetting breach of fiduciary duty; tortious interference with prospective relations; violation of the North Carolina Trade Secrets Protection Act; violation of the North Carolina Unfair Trade Practices Act; and civil conspiracy. The case was assigned to the North Carolina Special Superior Court for Complex Business Cases.

2. In Atlanta, by opening day in March 2000, every one of the fifteen employees of H&E's Atlanta branch had been hired from BPS; in Charlotte, by 5 June 2000, nine BPS staff were employed by H&E; in Orlando, by 22 May 2000, H&E employed BPS' entire outside sales staff; in Houston, by March 2000 H&E solicited and hired eight BPS employees; in Tampa/Fort Meyers, by 5 June 2000 H&E hired twenty-five BPS employees and over ninety percent of H&E employees in Tampa/Fort Meyers were former BPS employees; and in Dallas, by 20 March 2000 H&E hired nine BPS employees.

In an Opinion and Order dated 10 July 2002, Judge Ben F. Tennille granted partial summary judgment dismissing the breach of fiduciary duty claims against all defendants. The claim of aiding and abetting breach of fiduciary duty against H&E was also dismissed. The remainder of the claims proceeded to trial before Judge Tennille. At the close of plaintiff's evidence, the trial court granted Patrick C. Muldoon and Michele U. Dougherty's Rule 41(b) motion to dismiss all claims against them. On 2 May 2003 Judge Tennille entered an Order and Opinion ruling the remaining defendants were jointly and severally liable for each of the remaining claims with the exception of tortious interference with prospective relations. The trial court awarded damages of $5,000,000, which it then trebled under N.C. Gen. Stat. § 75-16 (2003). By Order entered 31 July 2003, the trial court also awarded plaintiff's attorney's fees of $1,200,000.00 under N.C. Gen. Stat. § 75-16. On 13 August 2003 Judge Tennille entered a final judgment for $16,200,000.00 together with pre-judgment and post-judgment interest of eight percent. Defendants appeal[3].

---

Defendants raise four issues on appeal: whether the trial court erred in (I) concluding plaintiff's compilation of business information constitutes a trade secret under N.C. Gen. Stat. § 66-152 (N.C. Trade Secrets Protection Act) and that defendants misappropriated trade secrets; (II) finding defendants violated N.C. Gen. Stat. § 75-1.1 (Unfair and Deceptive Trade Practices Act); (III) finding a proximate cause connection between plaintiff's lost profits and defendants' conduct in determining plaintiff's damages (and the trebling of such damages); and (IV) concluding plaintiff's claims of unlawful conduct were not barred by laches.

## Standard of Review

Since this appeal involves a bench trial, findings of fact made by the trial court have the "force and effect of a jury verdict and are conclusive on appeal if there is evidence to support them[.]" *Henderson County v. Osteen*, 297 N.C. 113, 120, 254 S.E.2d 160, 165 (1979). Appellate review of the trial court's conclusions of law is *de novo. McConnell v. McConnell*, 151 N.C. App. 622, 626, 566 S.E.2d 801, 804 (2002).

---

3. Plaintiff filed a Cross Notice of Appeal solely on the issue of damages yet fails to argue this issue in its brief, therefore, this assignment of error is deemed abandoned. N.C. R. App. P. 28(b)(6) ("Assignments of error not set out in the appellant's brief, or in support of which no reason or argument is stated or authority cited, will be taken as abandoned.").

**SUNBELT RENTALS, INC. v. HEAD & ENGQUIST EQUIP., L.L.C.**

[174 N.C. App. 49 (2005)]

We will consider the applicable findings and conclusions according to defendants' assignments of error. We note the extensive number of assignments of error which defendants do not argue. Therefore, we grant plaintiff's 21 October 2004 motion to exclude from consideration defendants' unargued assignments of error based on N.C. R. App. P. 28 (b)(6) and deem those assignments of error abandoned.

## I

**[1]** Defendants first argue the trial court erred in concluding plaintiff's compilation of business information constitutes a trade secret under N.C. Gen. Stat. § 66-152 (N.C. Trade Secrets Protection Act).

A trade secret is business or technical information that "[d]erives independent actual or potential commercial value from not being generally known or readily ascertainable through independent development . . . and [is] the subject of efforts that are reasonable under the circumstances to maintain its secrecy." N.C. Gen. Stat. § 66-152(3)(a)-(b) (2003). Factors to consider when determining whether an item is a trade secret are:

> (1) the extent to which information is known outside the business; (2) the extent to which it is known to employees and others involved in the business; (3) the extent of measures taken to guard secrecy of the information; (4) the value of information to business and its competitors; (5) the amount of effort or money expended in developing the information; and (6) the ease or difficulty with which the information could properly be acquired or duplicated by others.

*State ex rel. Utils. Comm'n v. MCI*, 132 N.C. App. 625, 634, 514 S.E.2d 276, 282 (1999) (citation omitted). Applying these factors, our courts have found the following to constitute a trade secret: cost history information[4]; price lists[5]; and confidential customer lists, pricing formulas and bidding formulas[6].

On the issue of whether plaintiff's compilation of business information constitutes a trade secret, defendants assign as error only the following four findings of fact:

---

4. *See Byrd's Lawn & Landscaping, Inc. v. Smith*, 142 N.C. App. 371, 542 S.E.2d 689 (2001).

5. *See Wilmington Star-News v. New Hanover Reg'l Med. Ctr.*, 125 N.C. App. 174, 179, 480 S.E.2d 53, 56 (1997).

6. *See Drouillard v. Keister Williams Newspaper Servs.*, 108 N.C. App. 169, 173, 423 S.E.2d 324, 327 (1992).

(16) AWP managers and salespeople know, from experience or simply by asking their customers, what type of equipment is needed by the different types of contractors for particular jobs. For example, electrical contractors will often use smaller scissor lifts or push-around lifts that can fit through interior doorways, while glass manufacturers working on the outside of buildings need taller boom lifts which can range up to 120 feet in height. Knowledge of the company's customer base contributes to higher utilization of equipment and better selection of the "fleet mix" for a particular market. Such information allows a business to invest in certain machines that yield better rates and profits. A new market entrant has a significant advantage if it has access to that information. With such information, a new entrant can maximize its initial fleet investment with little risk, perhaps saving millions of dollars, and can accurately project an operating budget.

. . .

(23) In terms of price, historical prices have limited value. Prices are quoted and then negotiated between the outside sales representative and the customer or over the telephone with inside sales coordinators. While salesmen would like for prices to remain "confidential," they understand and expect that prices will become known in the market. Customers do not consider quoted prices to be confidential and often reveal price sheets and quoted prices of competitors to obtain more favorable terms. AWP rental companies occasionally quote good customers a fixed price for a job or period of time; these arrangements would constitute confidential information. "Sealed bids" or other formal bidding processes are rarely used. Recent consolidation in the industry has made pricing extremely competitive and has created several large competitors.

. . .

(42) During Hepler's tenure as [BPS'] president, the senior management team met regularly, at least once per month. At its meetings, the senior management team discussed customers, mechanic availability, sales personnel, equipment utilization, safety, marketing, product mix, average rental rates, planning and other matters. Branches were regularly evaluated branch-by-branch. Senior management regularly shared BPS marketing, customer and internally developed information. This information included head counts, salary information, pricing,

**SUNBELT RENTALS, INC. v. HEAD & ENGQUIST EQUIP., L.L.C.**

[174 N.C. App. 49 (2005)]

organizational structure, financial projections and forecasts, cost information, branch budgets and customer information, including the identity, contacts and requirements of its rental customers, pricing in effect for those customers and fleet utilization information by branch. Senior management knew that this information was confidential.

(43) Defendants Hepler and Kline managed the day-to-day affairs of BPS, made strategic decisions, developed and implemented budgets and hired and fired employees. Hepler was involved in all levels of the business. He frequently visited branches, discussed up and coming job sites and sales personnel and was actively involved with customers. Kline was involved in all aspects of the business as the result of his financial responsibilities. In particular, he was extensively involved with branch managers in budgeting. Hepler and Kline were highly compensated. Hepler was paid a salary of $260,000 in 1999, and Kline was paid a salary of $160,000 to manage 24 branch operations throughout the Southeast and South Central United States. They had access to and knowledge of BPS'[] confidential business information.

Defendants argue plaintiff's "compilation of broad generalized categories of ever-changing business information" does not qualify as a trade secret. We disagree. Plaintiff considered the following to be confidential: its customer information, preferred customer pricing, employees' salaries, equipment rates, fleet mix information, budget information and structure of the business. The trial court determined such information was (1) not generally known outside BPS; (2) only discreetly disclosed within BPS; (3) guarded as secret (e.g. information removed from view when outsiders visited BPS' premises, pricing kept in special books, passwords used to protect computer access, file removal rules, and salary information kept under lock and key); (4) competitively valuable; (5) developed at significant cost to BPS; and (6) difficult to duplicate or acquire. In reaching such determinations, the trial court made numerous findings and conclusions as to defendants' lack of credibility, which defendants do not assign as error. Specifically, the trial court found with respect to testimony regarding the existence of defendants' "plan to raid BPS' key branches in an orchestrated manner and the use of the branch managers to do so . . . . [that] the uncontroverted actions [spoke] louder than words of denial[.]" *See e.g., Ryals v. Hall-Lane Moving & Storage Co.*, 122 N.C. App. 242, 246, 468 S.E.2d 600, 603 (1996) (trial

court determines witness credibility and weight to be given their testimony). With respect to trade secrets, the trial court found:

> (1) BPS/Sunbelt's compilation of information, including its special pricing information, customer information (identity, contacts and requirements of its rental customers), personnel and salary information, organizational structure, financial projections and forecasts, utilization rates, fleet mix by market, capital and branch budget information, and cost information, when taken together constitute[] trade secrets and (2) that the defendants misappropriated BPS/Sunbelt's trade secret information unlawfully.

Further, the trial court concluded:

> First, while there is some direct evidence of the purloining of documents or other written confidential information, the reality is that Hi-Lift hired the people from BPS/Sunbelt who had the expertise to run an AWP business effectively and they hired the salesmen who knew the customers and the market. Pricing information was of fleeting long-term [sic] value as the market was intensely competitive. Short-term pricing or special account pricing was of more value. Most of the information about fleet usage was in the heads of the key management people hired away. They knew the essential needs to get up and running, and, if they did not, the salesmen who were hired knew the customer requirements.

We therefore hold the trial court did not err in concluding plaintiff's compilation of business information constitutes a trade secret.

[2] Defendants also challenge the trial court's finding that defendants misappropriated trade secrets. N.C. Gen. Stat. § 66-152 (1) defines misappropriation of a trade secret as "acquisition, disclosure, or use of a trade secret of another without express or implied authority or consent, unless such trade secret was arrived at by independent development, reverse engineering, or was obtained from another person with a right to disclose the trade secret." N.C.G.S. § 66-152 (1) (2003).

With respect to misappropriaton of trade secrets, defendants assign as error findings of fact which relate to the hiring of BPS branch managers who used the confidential information of BPS to obtain sales and convert former BPS customers to H&E. Defendants

specifically assign error to the trial court's finding regarding their "astounding" profit:

> (251) Hi-Lift rentals increased by $30.8 million, or 130 percent, to $55.4 million in fiscal year 2001 over fiscal year 2000. Thus, in fiscal year 2001, Hi-Lift had almost eight times the revenue it had as of December 31, 1999. As stated by an industry expert, such results are "astounding." Moreover, the [c]ourt finds that these results confirm a number of points including:
>
> > (a) The mass departures severely injured Sunbelt, a result that could only have been intended by defendants or the product of callous disregard for the consequences.
> >
> > (b) Sunbelt/BPS' confidential business information was used by defendants; otherwise, their personnel could not have [] assembled so much business so quickly and efficiently.
> >
> > . . .
> >
> > (d) Defendants' activities were unfair, unethical and anticompetitive.

We note for the record defendants do not assign error to finding of fact number 251(e): "[Defendants'] actions resulted in a dramatic $3.7 million turnaround in performance in one year." In addition, defendants assign as error conclusions of law made by the trial court which focus on the circumstantial nature of the evidence pointing to the misappropriation of BPS' trade secrets as follows:

> (287) The evidence shows that the individual defendants knew BPS/Sunbelt's trade secrets and had access to them, and each had the opportunity to acquire them for disclosure and use. Prior to appropriating BPS employees, *en masse*, H&E had <u>no customers</u> in North Carolina, Georgia, or Florida. Despite this fact, the "new" H&E operations made a significant profit in their first year of operation—based on their taking of BPS/Sunbelt employees, trade secrets and customers—and the BPS branches experienced a concurrent, substantial decrease in business. This occurrence alone is circumstantial evidence of the defendants' use and disclosure of BPS trade secret information. Here, testimony supports that [d]efendant[s] misappropriated confidential customer information of BPS—testimony that [defendants] never rebutted. In addition, testimony of witnesses located in Tampa[/] Fort Myers, Dallas and Atlanta supports that confidential customer

> information was misappropriated by BPS employees who left and went to H&E. Indeed, in Tampa, identical confidential pricing was used by [a former BPS employee] after she went to H&E, and in Dallas, [another former BPS employee] took sales notes with him, even though he was purportedly instructed not to do so.

(Citations omitted) (emphasis in original). There was significant evidence before the trial court that defendants used and disclosed BPS' trade secrets. Under the NCTSPA, to show a *prima facie* case for misappropriation of trade secrets, a plaintiff must meet the burden of introducing substantial evidence that defendant "(1) [k]nows or should have known of the trade secret; and (2) [h]as had a specific opportunity to acquire it for disclosure or use or has acquired, disclosed, or used it without the express or implied consent or authority of the owner." N.C. Gen. Stat. § 66-155 (2003). An example of plaintiff's *prima facie* showing of misappropriated trade secrets follows: prior to hiring BPS' employees, defendants had no customers in North Carolina, Georgia or Florida; however, defendants' actions resulted in a $3.7 million turnaround[7] during 2001, while BPS branches in those same locations during that time experienced a concurrent, substantial decrease in business. In addition, there was no evidence defendants had a unified pricing structure at the time defendants began calling customers in North Carolina, Georgia or Florida. In fact, there is no evidence that defendants had independent business development in any of the new markets. Former BPS customers were rapidly identified, converted to defendant-H&E's customer base and extended credit based on knowledge obtained through BPS' former employees. Defendants failed to rebut this evidence establishing a *prima facie* case of misappropriation of trade secrets. For the reasons stated herein, these assignments of error are overruled.

## II

Defendants next argue the trial court erred by finding defendants violated N.C. Gen. Stat. § 75-1.1 (UDTPA)[8].

---

7. The trial court found "[a]s of December 31, 1999, H&E's AWP fleet had only generated rental revenue of $ 7.2 million, a gross profit of only $ 2.5 million and a pretax loss of $ 289,000.00. The results of H&E's employment of Hepler, Kline, Christensen and Quinn and their conspiratorial activities, were that Hi-Lift realized $ 23.4 million dollars in rentals by December 31, 2000, a gross profit of $ 16.9 million and a pre-tax profit of $ 3.4 million."

8. Subsumed in plaintiff's UDTPA claim, the trial court found plaintiff proved its tortious interference with prospective advantage claim. *Roane-Barker v. S. Hosp.*

Our Supreme Court has stated, "under N.C.G.S. § 75-1.1, it is a question for the jury as to whether the defendants committed the alleged acts, and then it is a question of law for the court as to whether these proven facts constitute an unfair or deceptive trade practice[.]" *United Labs., Inc. v. Kuykendall*, 335 N.C. 183, 187 n.2, 437 S.E.2d 374, 377 n.2 (1993) (citing *United Labs., Inc. v. Kuykendall*, 322 N.C. 643, 664, 370 S.E.2d 375, 389 (1988)). Under North Carolina's UDTPA a plaintiff must prove "(1) defendant committed an unfair or deceptive act or practice, (2) the action in question was in or affecting commerce, and (3) the act proximately caused injury to the plaintiff." *Dalton v. Camp*, 353 N.C. 647, 656, 548 S.E.2d 704, 711 (2001); *First Atl. Mgmt. Corp. v. Dunlea Realty Co.*, 131 N.C. App. 242, 507 S.E.2d 56 (1998); N.C. Gen. Stat. § 75-1.1 (2003). A practice is unfair if it is unethical or unscrupulous, and it is deceptive if it has a tendency to deceive. *Polo Fashions, Inc. v. Craftex, Inc.*, 816 F.2d 145 (4th Cir. 1987) (citing *Marshall v. Miller*, 302 N.C. 539, 548, 276 S.E.2d 397, 403 (1981)).

In the present case, the trial court found as fact, and the parties do not dispute, that plaintiff and defendants were competitors in the AWP rental business which affected commerce. After examining whether the acts of which plaintiff complains were unfair, unethical or unscrupulous, and effectively caused plaintiff's injury, the trial court concluded "[t]he surreptitious and intentional use of BPS employees to solicit other key employees while both the soliciting and solicited employees were still employed by BPS is an unfair trade practice." The trial court's conclusion was based on a number of findings that are fully supported by evidence in the record. For example, defendants told customers BPS' name had changed to H&E. Defendants used BPS' lease contracts and pricing information, inserting their company name on the documents. Newly hired H&E employees deleted BPS job information and forwarded BPS phones to H&E upon leaving BPS employment.

Further evidence showed key BPS employees were solicited to work for defendants *en masse*. In Atlanta, while still employed by BPS, an employee assisted defendants in securing a facility for Hi-Lift's branch. A few days later, the employee resigned from BPS

---

*Supply Corp.*, 99 N.C. App. 30, 392 S.E.2d 663 (1990) (by recruiting and hiring the plaintiff's employees, soliciting plaintiff's customers, and inducing salesmen to interfere with plaintiff's existing accounts, defendants had tortiously interfered with contracts or prospective contracts; such interference also violated N.C. Gen. Stat. § 75-1.1); *Owens v. Pepsi Cola Bottling Co.*, 330 N.C. 666, 680, 412 S.E.2d 636, 644-45 (1992); *Walker v. Sloan*, 137 N.C. App. 387, 392-93, 529 S.E.2d 236, 241 (2000).

and was told by another former BPS employee that his resignation would help cause instability at BPS in order to recruit others from BPS to join Hi-Lift. A few months later, every employee working in the Atlanta branch had been hired from BPS. Defendant-H&E's common pattern in opening new branches was to hire the BPS branch managers, direct them to recruit the top BPS personnel with little notice to BPS of the employees' departures. Based on past relationships with Hepler, BPS managers and their staff used knowledge previously acquired at BPS to perform work for defendant-H&E in the same geographical location and with the same customers. In keeping with this pattern, key BPS employees were lured away with sign-on bonuses and high compensation packages. By using former BPS employees and confidential information, defendant-H&E was able to tailor rental fleets at its branches without spending the time, money and effort necessary to develop such information. In fact, the actual profits generated by defendants' greenfields[9] should have taken much longer than it actually did (e.g. months, rather than days). Not only did defendants profit, but BPS branches were severely impacted, or "crippled," to the point BPS' opportunity and ability to compete for key employees on a level playing field was completely eliminated. Defendants' acts were unfair and unscrupulous and caused injury to plaintiff. The trial court concluded:

> The appellate court decisions dealing with unfair competition and conversion of business and employees demonstrate an awareness that competition is healthy and not to be unduly discouraged. Those decisions also evidence a desire to permit employees the greatest freedom of movement in order to maximize their job opportunities. . . . Nothing in this opinion should be read to depart from the trends evident in those decisions. Hepler and Kline were free to compete fairly, and each employee of BPS/Sunbelt was free to work for the employer he or she selected. The surreptitious way in which the BPS employees were solicited may have actually deprived them of the opportunity to see what Sunbelt would offer them to stay. None of the converted employees had the right to use BPS/Sunbelt confidential business information, but they could use the experience and contacts they had gained from years in the AWP business. The manner in which the branch managers were used was deceptive. That deception prevented fair competition for both employees and customers. The deceptive, secretive nature of defendants' actions differenti-

---

9. A greenfield is a startup branch in a market where there has been no prior presence.

ates this case from others where courts have found the hiring of competitor's employees to be acceptable.

(Citations omitted). "[T]he fair or unfair nature of particular conduct is to be judged by viewing it against the background of actual human experience and by determining its intended and actual effects upon others." *United Labs.*, 102 N.C. App. 484, 491, 403 S.E.2d 104, 109 (citations omitted), *aff'd*, 335 N.C. 183, 437 S.E.2d 374 (1993). In this case, defendants' particular conduct devastated, rather than competed with, plaintiff's existing AWP sales business in violation of the Unfair and Deceptive Trade Practices Act. This assignment of error is overruled.

### III

**[3]** Defendants next contend the trial court erred in awarding damages to plaintiff. Defendants argue that there is no proximate cause between plaintiff's lost profits and defendants' conduct. Defendants also argue the trial court erroneously calculated the damages even if plaintiff's trade secrets have been misappropriated.

Unfair and deceptive trade practices and unfair competition claims are neither wholly tortious nor wholly contractual in nature and the measure of damages is broader than common law actions. *Bernard v. Cent. Carolina Truck Sales, Inc.*, 68 N.C. App. 228, 230, 232, 314 S.E.2d 582, 584-85 (1984). Plaintiffs must prove damages to a reasonable certainty. *State Props., L.L.C. v. Ray*, 155 N.C. App. 65, 76, 574 S.E.2d 180, 188 (2002). In cases where a claim for damages from a defendant's misconduct are shown to a reasonable certainty, the plaintiff should not be required to show an exact dollar amount with mathematical precision. *See Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 75 L. Ed. 544 (1931); *Bigelow v. RKO Radio Pictures*, 327 U.S. 251, 90 L. Ed. 652 (1946); *see also Whiteside Estates, Inc. v. Highlands Cove, L.L.C.*, 146 N.C. App. 449, 462, 553 S.E.2d 431, 440 (2001) (noting that while the claiming party must present relevant data providing a basis for a reasonable estimate, proof to an absolute mathematical certainty is not required).

Defendants argue damages were speculative in that defendant-H&E did not make a profit in its first year. They assert the trial court violated N.C. Gen. Stat. § 66-154 because it awarded duplicate damages. Defendants incorrectly assert the trial court awarded plaintiff

duplicate damages. The trial court awarded damages under the UDTPA, not the NCTSPA. Under the UDTPA, plaintiff was awarded lost profits and the value of benefit defendants received, two different types of damages permitted under the UDTPA. N.C. Gen. Stat. § 75-16 ("If any person shall be injured or the business of any . . . corporation shall be broken up . . . or injured by reason of any act or thing done by any other person, firm or corporation in violation of the provisions of this Chapter, . . . if damages are assessed in such case judgment shall be rendered in favor of the plaintiff and against the defendant for treble the amount fixed by the verdict.").

Plaintiff's damages expert, Charles Phillips (Phillips) measured plaintiff's damages on the basis of (1) lost profit and (2) lost market share resulting from defendants' accelerated market entry in the amount of $31,647,391.00 over several years. Our court has previously addressed similar damages as to a UDTPA claim:

> Plaintiff was entitled to recover damages which were the natural and probable result of the tortfeasor's misconduct. Plaintiff showed 1. the sales and gross profits made by the salesmen to its customers during their last year of employment with plaintiff; 2. the sales plaintiff made to these same customers during the two-year period after the salesmen were employed with defendant, which was the period of the restrictive covenants; 3. the sales the salesmen made to those same customers during that two[-]year period on behalf of the defendant. [Defendants'] sales were made in the same geographic area and to the same customers as plaintiff's sales would have been. This evidence was both relevant and admissible. It was for the jury to decide how much weight to give such evidence. Plaintiff was entitled to show evidence of its lost profits by comparing its past history of profits with gross sales of plaintiff's former salesmen while working for defendant.

*Roane-Barker v. S. Hosp. Supply Corp.*, 99 N.C. App. 30, 40, 392 S.E.2d 663, 669-70 (1990) (citation omitted). Under the UDTPA, proximate cause is a question of fact. *See American Rockwool, Inc. v. Owens-Corning Fiberglass Corp.*, 640 F. Supp. 1411, 1445 (E.D.N.C. 1986).

The trial court did not err in finding defendants' acts were the proximate cause of plaintiff's damages based on the misappropriation of trade secrets and unfair and deceptive trade practices. This assignment of error is overruled.

IV

**[4]** In their final argument, defendants contend plaintiffs are barred from seeking relief by the doctrine of laches.

"The doctrine of laches requires a showing (1) that petitioner negligently failed to assert an enforceable right within a reasonable period of time, and (2) that the propounder of the doctrine was prejudiced by the delay in bringing the action." *Costin v. Shell*, 53 N.C. App. 117, 130, 280 S.E.2d 42, 44 (1981) (citing *Builders Supplies Co. v. Gainey*, 282 N.C. 261, 192 S.E.2d 449 (1972); *Rape v. Lyerly*, 287 N.C. 601, 215 S.E.2d 737 (1975)). The burden of proof is on the party who pleads the affirmative defense of laches. *Taylor v. Raleigh*, 290 N.C. 608, 622, 227 S.E.2d 576, 584 (1976). The statute of limitations applicable to the misappropriation of trade secrets is three years. N.C. Gen. Stat. § 66-157 (2003).

Plaintiff commenced this action on 13 July 2000, less than six weeks after Sunbelt's purchase of BPS was completed (on 1 June 2000). Plaintiffs filed their action well within the three year statute of limitations period which began from the time plaintiff had knowledge of defendants' improper conduct, as early as November 1999. As there was no delay in bringing the action, there can be no prejudice therefrom. This assignment of error is overruled.

Affirmed.

Judges TIMMONS-GOODSON and LEVINSON concur.