Charah, LLC v. Sequoia Servs., LLC, 2020 NCBC 32.

STATE OF NORTH CAROLINA

GUILFORD COUNTY

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
19 CVS 5795

CHARAH, LLC,

          Plaintiff,

v.

SEQUOIA SERVICES, LLC,

          Defendant.

**ORDER AND OPINION ON
DEFENDANT'S MOTION TO
DISMISS FOR FAILURE TO
STATE A CLAIM**

1.  **THIS MATTER** is before the Court on Defendant Sequoia Services, LLC's ("Sequoia") Motion to Dismiss for Failure to State a Claim (the "Motion"). (ECF No. 12.) The Motion seeks dismissal pursuant to Rule 12(b)(6) of the North Carolina Rules of Civil Procedure (the "Rule(s)") of Plaintiff Charah, LLC's ("Charah") claims for tortious interference with contract and unfair and deceptive trade practices.

2.  For the reasons set forth herein, the Court **GRANTS in part** and **DENIES in part** the Motion.

> *Moore & Van Allen PLLC by Paul J. Peralta and Sarah H. Negus, for Plaintiff.*
>
> *Tuggle Duggins, P.A. by Jeffrey S. Southerland, Denis E. Jacobson, and Richard W. Andrews, for Defendant.*

Robinson, Judge.

## I.    FACTUAL BACKGROUND

3.  The Court does not make findings of fact on a motion to dismiss pursuant to Rule 12(b)(6) but only recites those factual allegations that are relevant and necessary to the Court's determination of the Motion.

4. Charah is a limited liability company organized under Kentucky law, with its principal place of business and headquarters in Jefferson County, Kentucky. (Compl. for Monetary Damages ¶ 4, ECF No. 2 ["Compl."].) Charah provides management, operations, and marketing services in the coal combustion product ("CCP") industry, which includes coal ash management. (Compl. ¶ 8.) Charah provides these services to entities maintaining coal ash sites in several states, including at sites operated by Duke Energy Corp. ("Duke Energy") in Belew's Creek, North Carolina (the "Belew's Creek Site") and Roxboro, North Carolina (the "Roxboro Site"). (Compl. ¶¶ 9, 22, 29.)

5. Sequoia is a limited liability company registered to do business in North Carolina, with its principal office in Greensboro, North Carolina. (Compl. ¶ 5.) Sequoia performs work in North Carolina similar to that of Charah, including coal ash pond dewatering, dam repair and remediation, plant services, construction, environmental services, and site preparation. (*See* Compl. ¶¶ 1, 8, 47.)

6. Stephen D. Carroll ("Carroll") was employed by Charah beginning on or about December 23, 2015 until September 2017. (Compl. ¶¶ 10, 34–35.) Prior to his employment with Charah, Carroll interned at the construction company Phillips & Jordan, Inc. ("Phillips & Jordan"), where he became acquainted with Bruce Sekaly ("Sekaly"), a quality control manager there. (Compl. ¶¶ 43–44.) Sekaly left Phillips & Jordan to join Sequoia in September 2016. (Compl. ¶ 45.)

7. On November 2, 2015, in connection with his employment with Charah, Carroll signed an Employment, Confidentiality, Non-competition, Non-disclosure and

Non-solicitation Agreement (the "Employment Agreement"). (Compl. ¶ 11; *see* Compl. Ex. A., ECF No. 2 ["Employment Agreement"].)

8. Pursuant to section 7 of the Employment Agreement, Carroll agreed to be bound by certain restrictive covenants that would survive the termination of his employment with Charah. (*See* Employment Agreement § 7.) Specifically, section 7(b) of the Employment Agreement provides that Carroll would receive access to Charah's confidential information in the course of his employment and obligates Carroll not to utilize, disclose, or assist others in obtaining Charah's confidential information during, or any time after the termination of, his employment with Charah. (Employment Agreement § 7(b).)

9. The Employment Agreement defines Charah's confidential information as Charah's "trade secrets and sensitive proprietary information about [Charah's] business practices, procedures, methods, protocols, strategies and systems which provide [Charah] with a competitive advantage in the marketplace, and which, if obtained and used by a competitor, could be harmful to [Charah's] business, and which are maintained in confidence within [Charah]." (Employment Agreement § 7(a).)

10. The Employment Agreement also contains non-competition and non-solicitation provisions. (*See* Employment Agreement § 7(e), (f).) The non-competition provision restricts Carroll, during his employment and for a twenty-four-month period thereafter, from working, either directly or indirectly, for a competitor of Charah within a 250-mile radius of any Charah project site. (Employment

Agreement § 7(f).) The non-solicitation provision restricts Carroll, during his employment and for a twenty-four month period thereafter, from directly or indirectly soliciting "business of the type being performed by [Charah] from any individual or entity which is then a customer of [Charah]" or from "induc[ing], solicit[ing], [or] encourag[ing] any . . . entity which is a customer . . . of [Charah] . . . to cease doing business with the [Charah.]" (Employment Agreement § 7(e).)

11. When Carroll first began working for Charah, he worked as a field engineer. (Compl. ¶ 23.) He later assumed the role of project manager at the Belew's Creek Site and worked as a project engineer at the Roxboro Site. (Compl. ¶¶ 23, 29.) While working as a project engineer at the Roxboro Site, Carroll performed coal-ash related work on behalf of Charah for Duke Energy. (Compl. ¶ 29.)

12. While employed with Charah, Carroll had access to Charah's confidential information, including, but not limited to, the following: information related to coal ash excavation, processing and removal techniques and methods, technical data regarding coal ash management and disposal, personnel data, project requirements, labor rates, customer-pricing information, customer contracts, client-specific forms, client- and project-specific documents such as safety and project readiness documents, and subcontractor information including pricing, rates, and markup information. (Compl. ¶¶ 30–31.) Charah uses this confidential information to perform its work and formulate bids for work with its customers, including Duke Energy. (Compl. ¶¶ 21–22, 32–33.) Carroll regularly used Charah's confidential information in performing his work for Charah at the Belew's Creek and Roxboro

Sites, which included participating in on-site bidding and interacting daily with Duke Energy personnel. (Compl. ¶¶ 23–27, 33.)

13. On August 4, 2017, Carroll notified Charah that he intended to terminate his employment, but he continued working for Charah for five more weeks. (Compl. ¶¶ 34–35.) Charah alleges that, during this five-week period, Carroll repeatedly, and without Charah's consent, used personal electronic storage devices to copy Charah's confidential information from his work-issued laptop and transfer it to his personal laptop. (Compl. ¶¶ 36–41.) Carroll did not return the copied confidential information to Charah when his employment was terminated. (Compl. ¶ 42.)

14. In January 2018, after Carroll was no longer employed by Charah, Carroll contacted Sekaly regarding a position at Sequoia and was subsequently interviewed on January 23, 2018. (Compl. ¶¶ 49, 51.) On or about January 30, 2018, Carroll started working as a project manager for Sequoia, which was similar to his role at Charah. (Compl. ¶ 53.)

15. Charah alleges that Sequoia had limited CCP experience prior to hiring Carroll and had done no CCP management or removal for Duke Energy. (Compl. ¶¶ 54–55.) Charah further alleges that "Sequoia hired Carroll specifically to grow its CCP business with Duke [Energy]." (Compl. ¶ 55.)

16. On January 30, 2018, Sequoia submitted its budget for its first CCP project for Duke Energy, a coal ash management project at Belew's Creek called the North Coal Basin Project. (Compl. ¶¶ 56–57.) Within a few days of being hired, Carroll, on behalf of Sequoia, went to Belew's Creek to "reintroduce" himself to the Duke Energy

Project Manager, who provided him with details regarding the North Coal Basin Project. (Compl. ¶¶ 58–59.)

17. On February 5, 2018, Carroll, along with two other Sequoia representatives, Myron Lee and Chris Colangelo ("Colangelo"), participated in a conference call with the Duke Energy Project Manager to discuss the budget and dewatering needs for the North Coal Basin Project. (Compl. ¶¶ 61–62.) On February 12, 2018, Sequoia submitted a second budget for the North Coal Basin Project, and submitted a formal bid on March 21, 2018. (Compl. ¶¶ 63–64.) Charah also formally bid on the North Coal Basin Project; however, Duke Energy ultimately awarded the North Coal Basin Project to Sequoia. (Compl. ¶¶ 65–66.)

18. Charah alleges that "Carroll shared Charah Confidential Information with Sequoia employees on at least two occasions" and Sequoia used that information to further its relationship with Duke Energy. (Compl. ¶¶ 89, 94.) First, on February 14, 2018, Carroll emailed one of Charah's daily reports containing confidential information regarding Charah's work for Duke Energy to John Glover ("Glover"), a vice president at Sequoia. (Compl. ¶¶ 50, 90.) Charah alleges that Glover "encouraged Carroll to share this Confidential Information in order to compare Sequoia's daily report templates with those of Charah's." (Compl. ¶ 91.) Second, at some unspecified date in the first quarter of 2018, Carroll and Sekaly examined all of the files Carroll downloaded from Charah to identify a Charah quality control document relevant to Carroll's job responsibilities at Sequoia. (Compl. ¶ 93.)

19. On or around March 9, 2018, Charah learned that Carroll was soliciting work from Duke Energy on behalf of Sequoia. (Compl. ¶ 67.) On March 16, 2018, Charah's counsel notified Sequoia in writing that Carroll was subject to the terms of the Employment Agreement, enclosed a copy of the agreement for Sequoia's review, and contended that Sequoia's employment of Carroll violated the agreement. (Compl. ¶ 69.)

20. Notwithstanding Charah's warnings, Carroll continued to be employed by Sequoia and assist Sequoia on the Belew's Creek project from April 2018 through July 2018. (Compl. ¶ 70.) During this period of continued employment, Carroll assisted Sequoia on the Belew's Creek project by coordinating transport vendors to the North Coal Basin Project site for CCP removal and related work. (Compl. ¶ 70.) In addition, upon request by Glover, Carroll reviewed Sequoia's bid documents for another coal ash-related project for Duke Energy. (Compl. ¶¶ 71–73.) Sequoia subsequently submitted its bid on April 20, 2018 and was awarded the project. (Compl. ¶¶ 71, 74.)

21. Carroll's employment with Sequoia continued until September 6, 2018, when a Superior Court Judge entered a Consent Injunction against Carroll for breaching the Employment Agreement. (Compl. ¶¶ 76–77.)

22. Sequoia interviewed at least two additional Charah employees, beginning at the end of 2017 until early 2018, including Liz Warlick ("Warlick"). (Compl. ¶¶ 79–83.) During Warlick's interview, Glover and Colangelo asked Warlick detailed questions about Charah's business, including its work with Duke Energy; however,

Charah alleges that Sequoia intentionally avoided asking Warlick about a non-compete agreement.  (Compl. ¶¶ 84, 86.)

## II.    PROCEDURAL BACKGROUND

23.    The Court sets forth here only those portions of the procedural history relevant to its determination of the Motion.

24.    This lawsuit follows an earlier action in this Court that was dismissed without prejudice on March 11, 2019.  *See Charah, LLC v. Sequoia Servs., LLC*, 2019 NCBC LEXIS 18, at *22 (N.C. Super. Ct. Mar. 11, 2019).

25.    Charah initiated the present lawsuit against Sequoia by filing its Complaint on May 20, 2019 (the "Complaint").

26.    This action was designated as a complex business case on September 24, 2019 and assigned to the undersigned the same day.  (ECF No. 7.)

27.    The Motion and brief in support thereof were filed on October 3, 2019.  (Br. Supp. Def.'s Mot. Dismiss Failure State Claim, ECF No. 13 ["Br. Supp."].)  The Motion has been fully briefed, and the Court held a hearing on the Motion on January 30, 2020 at which Charah and Sequoia were represented by counsel.  (*See* ECF Nos. 15–17.)

28.    The Motion is now ripe for resolution.

## III.    LEGAL STANDARD

29.    In ruling on a motion to dismiss pursuant to Rule 12(b)(6) of the North Carolina Rules of Civil Procedure, the Court reviews the allegations in the Complaint in the light most favorable to Plaintiff.  *See Christenbury Eye Ctr., P.A. v. Medflow,*

*Inc.*, 370 N.C. 1, 5, 802 S.E.2d 888, 891 (2017). The Court's inquiry is "whether, as a matter of law, the allegations of the complaint . . . are sufficient to state a claim upon which relief may be granted under some legal theory[.]" *Harris v. NCNB Nat'l Bank*, 85 N.C. App. 669, 670, 355 S.E.2d 838, 840 (1987). The Court accepts all well-pleaded factual allegations in the relevant pleading as true. *See Krawiec v. Manly*, 370 N.C. 602, 606, 811 S.E.2d 542, 546 (2018). The Court is therefore not required "to accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *Good Hope Hosp., Inc. v. N.C. Dep't of Health & Human Servs.*, 174 N.C. App. 266, 274, 620 S.E.2d 873, 880 (2005) (citation omitted).

30. The Court "can reject allegations that are contradicted by the documents attached, specifically referred to, or incorporated by reference in the complaint." *Moch v. A.M. Pappas & Assocs., LLC.*, 251 N.C. App. 198, 206, 794 S.E.2d 898, 903 (2016) (citation omitted). The Court may consider these attached or incorporated documents without converting the Rule 12(b)(6) motion into a motion for summary judgment. *Id.* (citation omitted). Moreover, the Court "may properly consider documents which are the subject of a plaintiff's complaint and to which the complaint specifically refers even though they are presented by the defendant." *Oberlin Capital, L.P. v. Slavin*, 147 N.C. App. 52, 60, 554 S.E.2d 840, 847 (2001) (citation omitted). Where the Court considers documents that are not specifically referred to, contained in, or attached to the Complaint, the Rule 12(b)(6) motion will be converted into a

Rule 56 motion and subject to its standards of consideration and review. *Fowler v. Williamson*, 39 N.C. App. 715, 717, 251 S.E.2d 889, 890–91 (1979).[1]

31.     Our Supreme Court has noted that "[i]t is well-established that dismissal pursuant to Rule 12(b)(6) is proper when '(1) the complaint on its face reveals that no law supports the plaintiff's claim; (2) the complaint on its face reveals the absence of facts sufficient to make a good claim; or (3) the complaint discloses some fact that necessarily defeats the plaintiff's claim.'" *Corwin v. British Am. Tobacco PLC*, 371 N.C. 605, 615, 821 S.E.2d 729, 736–37 (2018) (quoting *Wood v. Guilford Cty.*, 355 N.C. 161, 166, 558 S.E.2d 490, 494 (2002)). This standard of review for Rule 12(b)(6) is the standard our Supreme Court "uses routinely . . . in assessing the sufficiency of complaints in the context of complex commercial litigation." *Id.* at 615, 821 S.E.2d at 737 n.7 (citations omitted).

## IV.     ANALYSIS

32.     Charah asserts two claims against Sequoia, one for tortious interference with contract and the other for unfair and deceptive trade practices. (Compl. ¶¶ 95–112.) Sequoia moves to dismiss both claims pursuant to Rule 12(b)(6). (Br. Supp. 1.)

---

[1] For the purposes of Rule 12(b)(6), the Court is limited to its review of the relevant pleading and any documents referred to in that pleading. *Moch*, 251 N.C. App. at 206 S.E.2d at 903 (citation omitted). The Court limits its review for the purposes of Rule 12(b)(6), only considering appropriate matters of record. *See Estate of Belk v. Boise Cascade Wood Prods., L.L.C.*, 824 S.E.2d 180, 183 (N.C. Ct. App. 2019) ("[T]he trial court is not required to convert a motion to dismiss into one for summary judgment simply because additional documents are submitted. . . Where it is clear from the record, namely from the order itself, that the additional materials were not considered by the trial court, the 12(b)(6) motion is not converted into a Rule 56 motion." (internal quotation marks, brackets, and citation omitted).)

## A. Tortious Interference with Contract

33. To state a claim for tortious interference with contract, the pleading must allege that:

> (1) a valid contract [exists] between the [claimant] and a third person which confers upon the [claimant] a contractual right against a third person; (2) the [opposing party] knows of the contract; (3) the [opposing party] intentionally induces the third person not to perform the contract; (4) and in doing so acts without justification; [and] (5) resulting in actual damage to [claimant].

*United Labs., Inc. v. Kuykendall*, 322 N.C. 643, 661, 370 S.E.2d 375, 387 (1988). "The pleading standards for a tortious interference with contract claim are strict." *Kerry Bodenhamer Farms, LLC v. Nature's Pearl Corp.*, 2017 NCBC LEXIS 27, at *16 (N.C. Super. Ct. Mar. 27, 2017).

34. Sequoia contends that Charah fails to adequately allege facts supporting each of the first four elements of its claim for tortious interference with contract. (Br. Supp. 1–2.) For the foregoing reasons, the Court concludes that Charah has failed to adequately allege that Sequoia acted without justification; therefore, the Court need not and does not address Sequoia's arguments relating to the validity of the Employment Agreement, knowledge, or inducement.

35. In part, Sequoia contends that the Complaint, on its face, discloses that Sequoia's alleged interference was justified. (Br. Supp. 1, 7–9.) Specifically, Sequoia argues that because the Complaint alleges that Charah and Sequoia are direct competitors, Sequoia had a "legitimate business interest in hiring capable employees, competing for Duke Energy's business, and engaging in other conduct to operate its business." (Br. Supp. 8; *see also* Reply Supp. Def.'s Mot. Dismiss 7–11, ECF No. 16

["Reply"].) Sequoia also asserts that the Complaint is legally deficient because "it contains no factual allegations of malice on the part of Sequoia," relying instead on general allegations of malice which are insufficient. (Br. Supp. 9–10; *see also* Reply 11.)

36. "A motion under Rule 12(b)(6) should be granted when the complaint [attempting to raise a claim for tortious interference with contract] reveals that the interference was justified or privileged." *Peoples Sec. Life Ins. Co. v. Hooks*, 322 N.C. 216, 220, 367 S.E.2d 647, 650 (1988). Interference is justified or privileged when it is "for a legitimate business purpose." *Id.* at 221, 367 S.E.2d at 650. "[C]ompetition in business constitutes justifiable interference in another's business relations and is not actionable so long as it is carried on in furtherance of one's own interest and by means that are lawful." *Id.*

37. A party's interference is "without justification" when it is "not reasonably related to the protection of a legitimate business interest," *Privette v. Univ. of N.C. at Chapel Hill*, 96 N.C. App. 124, 134, 385 S.E.2d 185, 190 (1989) (quoting *Smith v. Ford Motor Co.*, 289 N.C. 71, 94, 221 S.E.2d 282, 296 (1976)), but is instead motivated solely by malice, *Hooks*, 322 N.C. at 221, 367 S.E.2d at 650 ("If the defendant's only motive is a malicious wish to injure the plaintiff, his actions are not justified."); *Filmar Racing, Inc. v. Stewart*, 141 N.C. App. 668, 674, 541 S.E.2d 733, 738 (2001) (citing *Privette*, 96 N.C. App. at 134–35, 385 S.E.2d at 191) ("[W]e have held that the complaint must admit of no motive for interference other than malice.").

38. The malice required to sustain a tortious interference claim is legal, not actual, malice. *Childress v. Abeles*, 240 N.C. 667, 675, 84 S.E.2d 176, 182 (1954) ("It is not necessary, however, to allege and prove actual malice in the sense of personal hatred, ill will, or spite in order to make out a case [for tortious interference with contract]."). Legal malice "denotes the intentional doing of the harmful act without legal justification." *Id.* Not only must the complaint "admit of no motive for interference other than malice," but it must also provide "a factual basis to support the claim of malice." *Pinewood Homes, Inc. v. Harris*, 184 N.C. App. 597, 605, 646 S.E.2d 826, 832–33 (2007). Mere "general allegations of malice are insufficient." *Id.* at 605, 646 S.E.2d at 833 (citing *Spartan Equip. Co. v. Air Placement Equip. Co.*, 263 N.C. 549, 559, 140 S.E.2d 3, 11 (1965)).

39. In *Hooks*, the defendant was employed by the plaintiff as a district manager who supervised approximately forty-five insurance agents who sold and serviced insurance policies in a certain geographic area. *Id.* at 217–18, 367 S.E.2d at 648. After the defendant's employment with the plaintiff ended, he accepted employment with Monumental Life Insurance Company ("Monumental"), a competitor of the plaintiff, to develop territory. *Id.* at 218, 367 S.E.2d at 648. The defendant hired nineteen employees of the plaintiff to work at Monumental performing the same job function and in the same territory in which they worked for the plaintiff. *Id.* at 218–20, 367 S.E.2d at 648–49. When the defendant recruited these employees, he knew the terms of the non-compete agreements the employees had entered into with the plaintiff and that the employees' subsequent employment with Monumental violated

the non-compete agreements. *Id.* at 219, 367 S.E.2d at 649. The plaintiff in *Hooks* proceeded to bring a tortious interference with contract claim against the defendant for the defendant's alleged malicious interference with the plaintiff's former employees' employment contracts and the non-compete agreement therein. *Id.* at 218, 367 S.E.2d at 648.

40. The North Carolina Supreme Court in *Hooks* held that the plaintiff's complaint "reveal[ed] on its face . . . that the defendant was justified in offering the plaintiff's employees new jobs and locating them in their previously assigned territory." *Id.* at 221, 367 S.E.2d at 650. Specifically, the Supreme Court provided that "the hiring and placing of the plaintiff's former employees by the defendant for the purpose of developing the territory assigned to him by a company competing with the plaintiff amounted to justifiable interference. *Id.* at 222, 367 S.E.2d at 650. Based in part on *Hooks*, lower North Carolina Courts have held on multiple occasions that establishing a competing business is a legitimate business motive. *See Combs & Assocs. v. Kennedy*, 147 N.C. App. 362, 371, 555 S.E.2d 634, 641 (2001); *Salon Blu, Inc. v. Salon Lofts Grp., LLC*, 2018 NCBC LEXIS 72, at *13–14 (N.C. Super. Ct. July 16, 2018); *Daniel Grp., Inc. v. Am. Sales & Mktg.*, 2016 NCBC LEXIS 112, at *31–32 (N.C. Super. Ct. Dec. 15, 2016).

41. Charah alleges that Sequoia and Charah are direct competitors, (Compl. ¶ 1), and notwithstanding the non-compete and non-solicitation provisions in the Employment Agreement, "Sequoia hired Carroll specifically to grow its CCP business with Duke [Energy,]" a customer of Charah, (Compl. ¶ 55.) These facts, similar to

those in *Hooks*, reveal "a reasonable and *bona fide* attempt to protect [Sequoia's] interest" in growing and operating its business. *Hooks*, 322 N.C. at 220, 367 S.E.2d at 650. While Charah has alleged in conclusory fashion that "Sequoia's actions were malicious, willful, intentional, [] without justification[,] . . . [and] beyond the bounds of normal competitive behavior[,]" (Compl. ¶¶ 101–102), it has not pleaded facts supporting such claims. Such "general allegations of malice are insufficient as a matter of pleading." *Pinewood Homes, Inc.*, 184 N.C. App. at 597, 646 S.E.2d at 833; *see also Kerry Bodenhamer Farms, LLC*, 2017 NCBC LEXIS 27, at\* 17–18.

42. Because the Complaint on its face discloses that Sequoia's alleged interference was justified, the claim for tortious interference with contract fails and should be DISMISSED.

## B. Unfair and Deceptive Trade Practices

43. Charah also alleges that Sequoia committed unfair or deceptive trade practices ("UDTP") pursuant to N.C.G.S. § 75-1.1 by employing Carroll in violation of the Employment Agreement and by misappropriating Charah's confidential information to further its relationship with Duke Energy. (Compl. ¶¶ 94, 108–12.) Sequoia contends that the unfair or deceptive trade practices claim should be dismissed because "Charah's claim for tortious interference with contract, on which this claim is based, otherwise fails." (Br. Supp. 15; *see also* Reply 12.)

44. North Carolina law created a private right of action under Chapter 75 as part of its effort to protect consumers from unfair or deceptive trade practices. *See* N.C.G.S. § 75-1.1 (outlawing unfair or deceptive practices in trade); N.G.G.S. § 75-16

(creating a private right of action and authorizing treble damages); *see also Hardy v. Toler*, 24 N.C. App. 625, 630–31, 211 S.E.2d 809, 813 (1975). The protections of N.C.G.S. § 75-1.1 extend, in certain circumstances, to businesses as well. *Dalton v. Camp*, 353 N.C. 647, 656, 548 S.E.2d 704, 710 (2001) (citing *United Labs.*, 322 N.C. at 665, 370 S.E.2d at 389).

45. "[T]o establish a *prima facie* claim for unfair trade practices, a plaintiff must show: (1) defendant committed an unfair or deceptive act or practice, (2) the action in question was in or affecting commerce, and (3) the act proximately caused injury to the plaintiff." *Dalton*, 353 N.C. at 656, 548 S.E.2d at 711 (citing *Spartan Leasing, Inc. v. Pollard*, 101 N.C. App. 450, 460–61, 400 S.E.2d 476, 482 (1991)). "The Act does not . . . define an unfair or deceptive act, 'nor is any precise definition of the term possible.'" *Bernard v. Cent. Carolina Truck Sales, Inc.*, 68 N.C. App. 228, 229–30, 314 S.E.2d 582, 584 (1984) (quoting *Wachovia Bank & Trust Co. v. Smith*, 44 N.C. App. 685, 690, 262 S.E.2d 646, 649 (1980)). A trade practice "is unfair if it is unethical or unscrupulous, and it is deceptive if it has a tendency to deceive." *Sunbelt Rentals, Inc. v. Head & Engquist Equip., L.L.C.*, 174 N.C. App. 49, 59, 620 S.E.2d 222, 230 (2005) (citing *Polo Fashions, Inc. v. Craftex, Inc.*, 816 F.2d 145, 148 (4th Cir. 1987)).

46. "[O]ur courts have long recognized that claims for misappropriation of trade secrets and tortious interference with contract may form the basis of a UDTP claim." *S. Fastening Sys. v. Grabber Constr. Prods.*, 2015 NCBC LEXIS 42, at *28 (N.C. Super. Ct. Apr. 28, 2015) (citing *Drouillard v. Keister Williams Newspaper Servs., Inc.*, 108 N.C. App. 169, 172–73, 423 S.E.2d 324, 326–27 (1992); *United Labs.*, 322

N.C. at 665, 370 S.E.2d at 389). North Carolina courts have previously concluded that when the UDTP claim rests solely upon other claims, such as a claim for tortious interference with contract, which the court determines should be dismissed, the UDTP claim must fail as well. *See, e.g.*, *Combs & Assocs.*, 147 N.C. App. at 374, 555 S.E.2d at 642 ("[The] plaintiff's claim that defendants engaged in unfair and deceptive trade practices rests with its claims for misappropriation of trade secrets, tortious interference with contracts and civil conspiracy. Having determined that the trial court properly granted summary judgment on each of these claims, we likewise conclude that no claim for unfair and deceptive trade practices exists."); *Salon Blu, Inc.*, 2018 NCBC LEXIS 72, at *19–20 (citing *Amerigas Propane, L.P. v. Coffey*, 2015 NCBC LEXIS 98, at *40 (N.C. Super. Ct. Oct. 15, 2015) ("[T]he Court concludes that the dismissal of Defendants' trade secret and tortious interference claims extinguishes [the plaintiff's] UDTP claim[.]")).

47. However, Chapter 75 "creates a cause of action broader than traditional common law actions[.]" *Bernard*, 68 N.C. App. at 232, 314 S.E.2d at 585 (quoting *Marshall v. Miller*, 302 N.C. 539, 547, 276 S.E.2d 397, 402 (1981)). "Although certain [causes of action], standing alone, may evoke the action, a claim for unfair and deceptive trade practices pursuant to N.C.G.S. § 75-1.1 is an independent claim that stands alone as a distinct action[.]" *Sunbelt Rentals, Inc. v. Head & Engquist Equip., L.L.C.*, 2003 NCBC LEXIS 6, at *139 (N.C. Super. Ct. May 2, 2003). Therefore, so long as the complaint includes sufficient factual allegations of potentially unfair or deceptive conduct, the claimant may still maintain a UDTP claim, notwithstanding

the dismissal of breach of contract or tort causes of action based on the same conduct. *See, e.g.*, *Velocity Sols., Inc. v. BSG Fin., LLC*, 2016 NCBC LEXIS 19, at *7–8 (N.C. Super. Ct. Feb. 22, 2016) (granting the motion to dismiss the breach of contract claim but denying the motion to dismiss the UDTP claim where plaintiff alleged defendant had "specifically engaged and directed [plaintiff's former employee] to utilize [p]laintiff's confidential and proprietary information in order to achieve competitive gain").

48.     In part, Charah alleges that Sequoia committed unfair or deceptive trade practices by continuing to employ Carroll even after Sequoia had notice that Carroll's employment violated the terms of the Employment Agreement. (Compl. ¶ 108.) Our courts, however, have not found mere continued employment, without more, sufficient to constitute an unfair or deceptive trade practice. *Compare Bruning & Federle Mfg. Co. v. Mills*, No. COA04-999, 2005 N.C. App. LEXIS 2111, at *12–13 (N.C. Ct. App. 2005), *review denied*, 360 N.C. 174, 625 S.E.2d 782 (2005) (holding that "hir[ing] a former employee of [a] competitor and request[ing] that he diligently work on [the new employer's behalf]" is not an unfair or deceptive trade practice) *with United Labs. v. Kuykendall*, 102 N.C. App. 484, 491–92, 403 S.E.2d 104, 109 (1991) (affirming trial court's finding that defendant committed an unfair method of competition where defendant had offered to pay the legal fees of the plaintiff's former employee, and did so "[a]s a matter of routine practice"; "induc[ed] [the employee] to use his relationship with [plaintiff's] accounts and knowledge of confidential business information to attempt to divert to [defendant], unfairly, [plaintiff's] accounts"; and

"offered to subsidize [the employee's] income . . . in the event of an injunction"); *see also Legacy Data Access, LLC v. MediQuant, Inc.*, No. 3:15-cv-00584-FDW-DSC, 2017 U.S. Dist. LEXIS 198817, at *60–61 (W.D.N.C. Dec. 4, 2017) (concluding that the defendant had committed an unfair or deceptive trade practice where the defendant had unjustifiably interfered with the employment contract of the plaintiff's former employee; continued to employ the employee knowing it would cause him to violate his non-compete agreement; and paid the employee's attorneys' fees).

49. However, in addition to allegations regarding Sequoia's continued employment of Carroll, Charah also alleges that Sequoia committed an unfair or deceptive trade practice by misappropriating Charah's confidential information after hiring Carroll "to grow its CCP business with Duke [Energy]."[2] (Compl. ¶¶ 55, 108.) Specifically, Charah alleges that "Glover encouraged Carroll to share" a daily report containing Charah's confidential information "in order to compare Sequoia's daily report templates with those of Charah's." (Compl. ¶¶ 90–91.) In addition, Charah alleges that Sekaly and Carroll examined all of the files Carroll wrongfully downloaded from Charah. (Compl. ¶ 93.) Charah alleges, upon information and belief, that Sequoia then used this confidential information "to further its relationship with and work for Duke [Energy]." (Compl. ¶ 94.)

---

[2] The Court does not address the use of Charah's confidential information in the analysis of the tortious interference with contract claim because Charah does not sufficiently allege Sequoia induced Carroll to breach the confidentiality provisions of the Employment Agreement after Sequoia was notified of the existence of the agreement or its terms. *See KRG New Hill Place, LLC v. Springs Inv'rs, LLC*, 2015 NCBC LEXIS 20, at *14–16 (N.C. Super. Ct. Feb. 27, 2015); *Se. Anesthesiology Consultants, PLLC v. Rose*, 2019 NCBC LEXIS 52, at *28–29 (N.C. Super. Ct. Aug. 20, 2019).

50. This court has allowed UDTP claims based on misuse of confidential information to survive a motion to dismiss under Rule 12(b)(6). *See, e.g.*, *Velocity Sols.*, 2016 NCBC LEXIS 19, at *7–8 (denying the motion to dismiss a UDTP claim where the plaintiff alleged the defendant had "specifically engaged and directed [the plaintiff's former employee] to utilize the [p]laintiff's confidential and proprietary information in order to achieve competitive gain"); *CNC/Access, Inc. v. Scruggs*, 2006 NCBC LEXIS 22, at *27–31 (N.C. Super. Ct. Nov. 17, 2006) (denying a motion for summary judgment for a UDTP claim based on the defendant's alleged use of the plaintiff's confidential information); *see also United Labs.*, 102 N.C. App. at 491–92, 403 S.E.2d at 109 (affirming trial court's finding that the defendant's inducement of the plaintiff's former employee to use his "knowledge of confidential business information to attempt to divert to [the defendant], unfairly, [the plaintiff's] accounts . . . . constituted unfair methods of competition").

51. The Court does not conclude that Sequoia's conduct was as a matter of law unfair or deceptive. Charah will have to prove that on a more fully developed record. However, under the relaxed standards applicable at the initial pleading stage, Charah's factual allegations regarding Sequoia's misappropriation of Charah's confidential information are sufficient to state a UDTP claim. *Velocity Sols., Inc.*, 2016 NCBC LEXIS 19, at *8. Therefore, Sequoia's Motion should be DENIED.

# V.     CONCLUSION

52.    For the foregoing reasons, the Court hereby **GRANTS in part** and **DENIES in part** the Motion as follows:

A.    Sequoia's Motion is **GRANTED** as to Charah's tortious interference with contract claim and the claim is **DISMISSED**; and

B.    Sequoia's Motion is **DENIED** as to Charah's unfair and deceptive trade practices claim.

**SO ORDERED**, this the 17th day of April, 2020.


/s/ Michael L. Robinson
Michael L. Robinson
Special Superior Court Judge
  for Complex Business Cases